**MANAGEMENT COMPUTER SERVICES, INC., Plaintiff–Appellant,**

v.

**HAWKINS, ASH, BAPTIE & CO., et al., Defendants–Appellees.**

**No. 89–1097.**

United States Court of Appeals, Seventh Circuit.

Argued May 30, 1989.

Decided Aug. 23, 1989.

Harry E. VanCamp, Louderman, Hayes & VanCamp, Madison, Wis., for plaintiff-appellant.

Daniel W. Hildebrand, Ross & Stevens, Madison, Wis., for defendants-appellees.

Before CUDAHY, FLAUM and EASTERBROOK, Circuit Judges.

FLAUM, Circuit Judge.

This is an appeal from a grant of summary judgment to the defendants, dismissing plaintiff's claim under 18 U.S.C. § 1961 *et seq.,* the Racketeer Influenced and Corrupt Organizations Act ("RICO"). The sole issue on appeal is whether plaintiff raised a genuine issue of material fact as to wheth-

er defendants' conduct constituted a pattern of racketeering. We affirm.[1]

## I.

Plaintiff–Appellant Management Computer Services, Inc. ("MCS") is a Wisconsin corporation engaged in the business of designing, programming, selling, and licensing computer equipment and computer software. One aspect of MCS's business is providing computers and computer services to meet the accounting needs of public housing authorities ("PHAs"). Defendant–Appellee Hawkins, Ash, Baptie & Co. ("HABCO") is a Wisconsin public accounting firm that provides accounting services to, among others, PHAs. Defendant–Appellee Hawkins, Ash, Baptie, Inc. ("HABINC") was formed by HABCO to provide, among other things, computer services to HABCO and its PHA clients.

This action arose out of HABCO's alleged unauthorized use and copying of certain software that was allegedly owned by MCS. Originally a division of HABCO, MCS was formed in 1968 to act as a service bureau providing computer services to HABCO and its clients. In 1970, MCS was separately incorporated with the HABCO partners and members of their families owning a majority of the MCS stock. After the incorporation, HABCO and MCS maintained a working relationship (the exact nature of which is in dispute).

In approximately 1968, MCS (then a division of HABCO) began developing computer software on a Burroughs mainframe computer to meet the accounting need of PHAs. Around 1978, MCS and HABCO, now separate entities, recognized that the Burroughs computer system was becoming obsolete and began discussing a project to prepare software to be used in connection with a Data General mini-computer system.

(We note that MCS characterizes the project as "the developing of new software," while HABCO characterizes the project as "the converting of the old software." To remain neutral, we have characterized the project as "preparing the software.") As a result of these discussions, the parties agreed that MCS would redeem all of the stock owned by the HABCO partners and their families and that MCS would prepare the software. At the time of the redemption, neither HABCO nor MCS carried the existing software on its books as assets—*i.e.*, the software existing prior to either "development" or "conversion."

After the redemption of stock was completed, the parties signed a contract under which MCS was to sell HABCO a Data General mini-computer and prepare software for use on that computer. Pursuant to the contract, HABCO paid MCS $520,-000. The purpose of the payment as well as the meaning of the contract provisions relating to ownership and use of the prepared software are in dispute. We will now refer to this software as the "contract software" or "contract programs." On or about October 31, 1981, the Data General computer, which MCS had set up with the contract software and HABCO's data, was moved to the HABCO premises. Around that same time, MCS had stored at the HABCO premises copies ("back-up tapes") of the software. MCS alleged that the back-up tapes contained both the contract programs and its own non-contract programs.

Sometime shortly after the installation of the Data General computer, HABCO made copies of the back-up tapes. MCS alleged that HABCO used several non-contract programs contained on the back-up tapes to develop various other programs. HABCO has admitted one such use of the back-up

---

1. Plaintiff's notice of appeal did not specify the final judgment, but rather stated that the appeal was from the order granting defendants' motion for summary judgment, the order denying plaintiff's motion for reconsideration, and the order denying plaintiff's requests to deny or stay the imposition of costs. This court has not treated a failure to specify the final judgment in the notice of appeal as a jurisdictional bar to appeal if "the intent to appeal from the judgment complained of may be inferred from the notice and if the appellee has not been misled by the defect." *Cardoza v. Commodity Futures Trading Com'n,* 768 F.2d 1542, 1546 (7th Cir.1978). Here, the intent to appeal from the final judgment is clear, and the defendants do not claim to have been misled. We therefore treat this appeal as an appeal from the final judgment.

tapes (although HABCO may dispute that the program it used from the back-up tapes was a non-contract program proprietary to MCS); it admits that it used the back-up tapes to develop an "accounts receivable" program and used that program for its own internal purposes and for one client. In addition to the allegations concerning use of the back-up tapes, MCS alleged that HABCO made unauthorized use of the contract software that was delivered with the Data General computer. Specifically, MCS alleged that HABCO made unauthorized copies of the contract software, used those copies on non-designated equipment, sold or licensed copies of the contract software to PHAs across the country, transferred the contract software to HABINC for its use, and converted certain contract programs for use on an Altos computer system.

MCS brought this action in the federal district court, alleging fraud, breach of contract, unjust enrichment, and violation of RICO. The district court granted summary judgment to the defendants on the RICO claim, finding that plaintiff had failed to show that it would be able to establish at trial that defendants' alleged conduct constituted a pattern of racketeering. The court then dismissed the pendent state claims. MCS appeals the dismissal of the RICO claim.

## II.

■ Under the definitions set forth in the RICO statute, a pattern of racketeering activity requires "at least" two predicate acts of racketeering committed within a ten-year period. 18 U.S.C. § 1961(5). It is well settled, however, that merely alleging that the defendant committed two predicate acts does not fulfill the pattern requirement. *Sedima, S.P.R.I. v. Imrex Co.*, 473 U.S. 479, 496 n. 14, 105 S.Ct. 3275, 3285 n. 14, 87 L.Ed.2d 346 (1985) ("continuity plus relationship" must be shown to establish a pattern of racketeering); *see also Lipin Enterprises, Inc. v. Lee*, 803 F.2d 322, 323–24 (7th Cir.1986) (allegations of fraud involving one transaction injuring one victim insufficient to establish RICO

pattern); *Elliott v. Chicago Motor Club Insurance Co.*, 809 F.2d 347 (7th Cir.1986) (no pattern where all allegations of fraud related to the settlement of insurance claim arising out of one automobile accident). This circuit has followed a multifactor approach in determining whether a defendant's conduct constituted a pattern. The factors include "the number and variety of predicate acts and the length of time over which they were committed, the number of victims, the presence of separate schemes and the occurrence of distinct injuries." *Morgan v. Bank of Waukegan*, 804 F.2d 970, 975 (7th Cir.1986). We stated in *Morgan* that no one factor is necessarily determinative. Rather, the focus of the inquiry is to determine whether the predicate acts "can fairly be viewed as constituting separate transactions," *id.* at 975, inflicting separate injuries and thus can be said to represent a pattern.

The Supreme Court this year attempted to provide additional guidance. The question before the Court in *H.J. Inc. v. Northwestern Bell Telephone Co.*, — U.S. —, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989), was whether the pattern element requires allegation and proof of more than one scheme. The Court answered the question in the negative, finding that the " 'scheme' concept is highly elastic" and that introduction into the analysis of this "amorphous" term would only add more uncertainty to an already uncertain area. *Id.* at — n. 3, 109 S.Ct. at 2901 n. 3. Adhering to the *Sedima* formulation, the Court indicated that the inquiry should focus on the two concepts of continuity and relationship. The Court explained that the predicate acts meet the relationship requirement if they are "criminal acts that have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *Id.* at —, 109 S.Ct. at 2901. " 'Continuity,' " the Court stated, "is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." *Id.* at —, 109 S.Ct. at 2902.

We find these explanations of the terms continuity and relationship to be somewhat elastic. *See id.* at ——–——, 109 S.Ct. at 2906–2909 (Scalia, J., concurring in the judgment). What is evident from the Court's opinion, however, is that Congress intended "a natural and commonsense approach to RICO's pattern element," *id.* at ——, 109 S.Ct. at 2899, and that "Congress was concerned in RICO with long-term criminal conduct," *id.* at ——, 109 S.Ct. at 2902. Given these two guidelines, we believe that the factors identified in *Morgan*—with the exception of our focus on the presence of separate schemes—are still useful in analyzing the pattern element.

■ The case at hand is essentially a contract dispute involving one "victim," one transaction between the parties, and, at most two predicate acts—the allegedly unauthorized copying of the contract programs and the allegedly unauthorized copying of the back-up tapes. MCS contends that each time HABCO made another use of the software it had copied, it committed another predicate act. We disagree. If, as MCS alleged, the contract software at issue was proprietary to MCS, then when HABCO first copied that software it in essence stole the software. HABCO's subsequent use of the allegedly stolen software cannot be characterized as subsequent thefts. When a thief steals $100, the law does not hold him to a new theft each time he spends one of those dollars. The same is true of the back-up tapes. Indeed, the copying of the back-up tapes might be characterized as the first allegedly unauthorized copying of *both* the non-contract and the contract software. If so characterized, then at that point HABCO had stolen all of the software. Its subsequent and varied uses of the stolen software would not constitute new offenses but would go only to the issue of damages.[2] This is simply not a case that involves long-term criminal conduct or activity that could, in commonsense, be called a pattern of racketeering.

2. We note that the federal copyright laws, 17 U.S.C. § 101 *et seq.* are not at issue, and this

III.

For the reasons stated herein, the judgment of the district court is affirmed.

discussion has no bearing on copyright law.