**UNITED STATES TEXTILES, INC.,**
**Plaintiff–Appellant,**

v.

**ANHEUSER–BUSCH COMPANIES,**
**INC. and Busch Entertainment**
**Corporation, Defendants–Appellees.**

No. 89–1296.

United States Court of Appeals,
Seventh Circuit.

Argued Dec. 12, 1989.

Decided Aug. 31, 1990.

Martin Gerber, Chicago, Ill., Jack R. Ormes, Encino, Cal., Larry E. Parrish, Memphis, Tenn., for plaintiff-appellant.

John T. Hickey, Jr., James P. Cusick, Kirkland & Ellis, Chicago, Ill., for defendants-appellees.

Before WOOD, Jr., CUDAHY, and KANNE, Circuit Judges.

KANNE, Circuit Judge.

Four years after the demise of its business relationship with Busch Entertainment Corp., United States Textiles, Inc. filed a fourteen-count complaint in the district court alleging seven violations of the civil provisions of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–1968, and seven violations of Tennessee common law. Judgment was entered in favor of Busch Entertainment through the district court's rulings on two separate motions for summary judgment. United States Textiles appeals from those decisions. We affirm.

## I.

United States Textiles, Inc. ("UST") was in the business of manufacturing and screen-printing t-shirts and other accessory sportswear. Busch Entertainment, a subsidiary of Anheuser–Busch Companies, Inc., was in the business of operating

Busch Gardens theme parks in various cities across the country. Beginning in late 1979 and continuing through November of 1980, Busch Entertainment ("Busch") hired UST under a "cut, make and trim" system to manufacture promotional t-shirts for use and sale at Busch's theme parks. Under this system, Busch would purchase the raw fabric and have it delivered to UST's plant/warehouse in Tennessee. UST would manufacture the raw fabric into t-shirts according to the specifications submitted by Busch and then ship the finished product to Busch. Because Busch owned the raw fabric under this system, UST was paid only for the labor costs incurred in the manufacturing process. Moreover, except for the individual purchase orders Busch would submit, no written contract governed this "cut, make and trim" system.

In September or October of 1980, Busch Entertainment informed UST that it wished to switch from the "cut, make and trim" system to a "finished goods" system. After discussing how the change would take place, the parties agreed that UST would purchase all of the raw fabric owned by Busch and stored at UST as of December 1, 1980. This purchase was necessary because, under the "finished goods" system, Busch would no longer own any inventory at UST's plant in Tennessee. Rather, UST would purchase the raw fabric, then Busch would pay UST for both the fabric and the labor associated with the manufacturing process. In anticipation of this switch, Busch advised UST that auditors would travel to UST's facility in Tennessee on December 1, 1980 to conduct a physical count of the fabric and to negotiate a price for its sale. The events which transpired during this December 1 meeting between the parties and the contract which precipitated therefrom serve as the foundation for UST's civil RICO and state common law allegations. Precisely what transpired both prior to and during this meeting, however, is not firmly established.[1]

According to UST, Busch began to experience inventory-control and accounting problems in mid–1980 which ultimately manifested themselves in inventory shortages throughout Busch's promotional and merchandising departments. The fact that Busch wished to alter its business relationship with UST from a "cut, make and trim" system to a "finished goods" system and the inventory count which that switch necessitated, according to UST, were simply the beginnings of a scheme by which Busch sought to force UST to assume the blame and financial responsibility for the perceived inventory shortages. Specifically, UST asserts that Busch was able, through a series of "sham audits" and by virtue of its superior bargaining position vis-a-vis UST, to place the blame for the inventory shortages on UST. The end result of Busch's activities was the December 4, 1980 contract, the terms of which required UST to make up the $2.55 million inventory deficit through a series of discounted t-shirt transactions. According to UST, Busch "convinced" them to enter into this contract by issuing an ultimatum to the effect that if UST did not accept this offer, Busch would withdraw all of its business.

Busch disputes UST's version of the events which preceded the December, 1980 contract. According to Busch, UST was informed that Anheuser–Busch auditors would travel to UST's facilities on December 1, 1980 to conduct a physical count of the Busch fabric and to negotiate a price at which UST would purchase that fabric. Busch maintains, however, that prior to its auditors' arrival on that date, UST removed from its plant several hundred thousand

---

1. Although a "Statement of Uncontested Facts" (Joint Pretrial Order, May 13, 1988) facilitates our understanding of the facts of this case to a certain extent, even it does not completely resolve all of the factual disputes. The problem: some of the facts which are listed as "uncontested" in this "Statement of Uncontested Facts" are also listed as "contested" in a separate "Agreed Statement of the Contested Issues of Fact" contained in this same pretrial order. Because we are obligated to draw all reasonable inferences in favor of UST in reviewing the propriety of the district court's grant of Busch's motions for summary judgment, *Crop–Maker Soil Serv., Inc. v. Fairmount State Bank,* 881 F.2d 436, 438 (7th Cir.1989), we will regard these facts as "contested".

dollars worth of Busch's raw fabric. This inventory shortage, according to Busch, was discovered only after the auditors had begun counting the fabric. Moreover, the exact amount of the inventory shortage was never known, according to Busch, because UST prematurely ordered Busch to stop counting the inventory. Although UST never confirmed Busch's allegation that it had stolen the missing inventory, UST did negotiate a written contract with Busch—the December 4, 1980 contract—whereby UST committed itself to making up the alleged inventory deficiency through $2.55 million in future discounts of 40% on t-shirt orders.

Busch ordered t-shirts from UST under this December 4, 1980 contract until early 1982. The last of the discounted t-shirts, together with the UST invoice showing the discount and the net amount due from Busch, were sent from UST to Busch on March 26, 1982. These final discounted invoices were paid by Busch on April 25, 1982.

Busch continued to purchase t-shirts from UST until September of 1982. However, because the $2.55 million deficit had been recovered under the prior discounted purchases, Busch paid the full price for the t-shirts ordered after April of 1982. According to UST, Busch was obligated to make these purchases (and apparently an unknown number of additional purchases) pursuant to an oral contract which the parties had entered into at the time of the December, 1980 contract. Under the terms of this alleged oral contract, Busch obligated itself to purchase 2,000 dozen t-shirts per week from UST for an indefinite period of time once the $2.55 million inventory deficit had been recovered. Busch denies that such an oral contract ever existed.

During this entire period—from late 1979 through May, 1982—UST had a contract with Barclays–American Bank under which Barclays "factored" UST's accounts receivable. Under this arrangement, UST would send Barclays a copy of all of its invoices which evidenced sales and shipments of t-shirts to its customers. Upon receipt of those invoices, Barclays would extend immediate cash or credit to UST at a discounted amount. In return, UST's customers were instructed by UST to send their invoice payments to Barclays. According to Busch, UST began in late 1981 to bill Busch and other customers (through Barclays) for goods that had not been shipped. Specifically, Busch contends that UST sent Barclays fictitious accounts receivable for $450,000 representing goods that had never been sent to Busch. Moreover, according to Busch: this alleged scheme was uncovered in February of 1982; Barclays investigated and, as a result, stopped factoring UST's invoices; and, UST soon thereafter ceased its operations. UST does not deny that Barclays served as its factor, but does deny the allegations regarding the fictitious accounts receivable.

UST did not file this action in the district court until April 22, 1986, more than four years after the last shipment of discounted t-shirts had been sent and just under four years from the date that Busch paid the discounted invoices on that last shipment. The complaint alleged federal civil RICO violations in Counts 1 through 7. As predicate acts to support its RICO claims, UST alleged that Busch committed extortion in violation of the Hobbs Act and Travel Act when it forced UST to enter into the December, 1980 contract. UST also alleged mail fraud and wire fraud. These latter allegations, although not pleaded with particularity, refer to the manner in which Busch used the interstate mail and wires over the following two years to order and receive the discounted t-shirts. Counts 8 through 14 of the complaint alleged violations of state common law. Those common law counts which are on appeal, Counts 8 and 14, alleged a "conspiracy to injure business" and "economic duress" respectively.[2]

After the close of discovery, Busch filed its first motion for summary judgment on each of the fourteen counts of the com-

---

**2.** Busch filed a counterclaim against UST alleging, in part, conversion of Busch inventory prior to the December, 1980 audit. The counter-claim was dismissed by the district court and is not at issue before this court.

plaint. The district court, on March 29, 1988, granted Busch's motion on all of the state common law claims. With respect to the civil RICO counts, the district court held that RICO's four-year statute of limitations, *see Agency Holding Corp. v. Malley–Duff & Assocs., Inc.*, 483 U.S. 143, 107 S.Ct. 2759, 97 L.Ed.2d 121 (1987), barred UST from recovering for damages which were incurred or caused by predicate acts which occurred prior to April 22, 1982. Since there was no showing of mail or wire fraud after April 21, 1982, UST was left only with the potential for recovery on the allegations of extortion in violation of the Hobbs Act and Travel Act. Because each shipment of t-shirts was a separate use of the interstate facilities and, as such, a separate Travel Act violation, *see United States v. Raineri*, 670 F.2d 702, 715 n. 9 (7th Cir.), *cert. denied*, 459 U.S. 1035, 103 S.Ct. 446, 74 L.Ed.2d 601 (1982), and because Hobbs Act extortion encompassing multiple payments is a continuing offense, *see United States v. Hedman*, 630 F.2d 1184, 1199 (7th Cir.1980), the district court concluded that any shipments of t-shirts or payments of extorted money which occurred after April 21, 1982, could serve as predicate acts to support the RICO claims.

On May 13, 1988, the parties filed a Joint Pretrial Order before the district court. This pretrial order contained, among other things, a "Statement of Uncontested Facts" and an "Agreed Statement of Contested Issues of Fact". *See* note 1, *supra.* Based on certain statements contained in the "Statement of Uncontested Facts",[3] Busch filed a second motion for summary judgment on the remaining RICO claims arguing that the "uncontested facts" showed that no extortion had occurred.

On August 30, 1988, the district court ruled in favor of Busch on the RICO allegations which had survived the first summary judgment motion. Specifically, the court initially noted that all of the RICO claims alleging Travel Act violations were time-barred under RICO's four-year statute of limitations because it had become apparent that the last shipment of discounted t-shirts was sent on March 26, 1982. With respect to the RICO counts based on alleged Hobbs Act violations, the court concluded on the basis of the "Statement of Uncontested Facts" that UST had not sufficiently proved that extortion occurred.

## II.

In this appeal, UST challenges the propriety of the district court's grant of summary judgment on Counts 1 through 5 and 7 (civil RICO counts) and Counts 8 and 14 (state common law counts).[4] With regard to the civil RICO counts, UST argues: (1) that there was sufficient evidence in the record to raise a material question of fact as to whether Busch committed extortion in violation of the Hobbs Act; (2) that there was evidence in the record to prove that Busch did use the interstate mail and wires after April 21, 1982; and, (3) that summary judgment based on the limitations period was error because the cause of action in a RICO case does not accrue until the last predicate act in the "pattern" has occurred. We need not address any of these claims in that we conclude that UST has failed to allege a sufficient "pattern of racketeering activity" to support its RICO claims.

With regard to the state law claims, UST argues: (1) that the district court erred in dismissing Count 8 as time-barred because Tennessee's residual ten-year limitations

---

**3.** Submitted as "uncontested" in this pretrial order were the following:

    18. Busch Entertainment advised UST that A–B auditors would travel to UST on December 1 to confirm Busch Entertainment's accounting records and to negotiate the price for the sale of the Busch Entertainment raw fabric. . . .

    19. Prior to the A–B auditors' arrival, UST had removed from its plant several hundred thousand dollars of Busch Entertainment raw fabric.

**4.** In oral argument, UST intimated that the district court's dismissal of Count 12 (breach of oral contract for 2000 dozen t-shirts per week) is also on appeal. UST, however, has failed to demonstrate why this alleged oral contract is not unenforceable under the statute of frauds as the district court ruled in its March 29, 1988 order. Accordingly, we affirm the dismissal of Count 12 without further discussion.

period applies to that "injury to business" allegation; and, (2) that the district court erred in dismissing Count 14 of the complaint because it does allege a valid cause of action under Tennessee law.

### A. Federal Civil RICO: Pattern Requirement

In support of its initial motion for summary judgment, Busch argued that the RICO counts should be dismissed because of UST's failure to allege a "pattern of racketeering activity" sufficient to support those claims. The district court rejected this argument, concluding that UST had satisfied the "pattern" requirement of the RICO statute. We disagree.

■ A crucial element of any RICO claim under 18 U.S.C. § 1962 is proof of either a "pattern of racketeering activity" or the "collection of an unlawful debt". *Elliot v. Chicago Motor Club Ins.*, 809 F.2d 347, 349 (7th Cir.1986). With this fact in mind, UST alleged in support of its RICO claims that Busch had engaged in a "pattern of racketeering activity" through the commission of various acts of extortion, mail fraud and wire fraud.[5] The fact that a "pattern" is alleged, however, does not necessarily satisfy the pleading requirements of the RICO statute. Rather, the allegations which come together to form the alleged "pattern" must be examined to determine whether they justify the potential application of the enhanced penalties of the federal RICO statute. As the fourth circuit recently noted in *Menasco v. Wasserman*, 886 F.2d 681, 683 (4th Cir.1989):

> [t]he 'pattern' requirement is more than incidental to the operation of the RICO statute. In providing a remedy of treble damages for injury 'by reason of a violation of' RICO's substantive provisions, 18 U.S.C. § 1964(c), Congress contemplated that only a party engaging in widespread fraud would be subject to such serious consequences.

Regrettably, however, a concrete definition for precisely what activity will constitute a "pattern" for purposes of the RICO statute has eluded the federal courts.

Focusing on the "continuity plus relationship" formulation set forth by the Supreme Court in *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496, 105 S.Ct. 3275, 3285 n. 14, 87 L.Ed.2d 346 (1985), this circuit has adopted and followed a fact-specific, multi-factor approach in determining whether a particular defendant's conduct constitutes a "pattern" for purposes of the RICO statute. Specifically, we have held that four factors should be considered in making this determination: (1) the number and variety of predicate acts and the length of time over which they were committed; (2) the number of victims; (3) the presence of separate schemes; and, (4) the occurrence of distinct injuries. *Morgan v. Bank of Waukegan*, 804 F.2d 970, 975 (7th Cir. 1986); *see also Triad Associates, Inc. v. Chicago Housing Authority*, 892 F.2d 583, 594 (7th Cir.1989); *Ashland Oil, Inc. v. Arnett*, 875 F.2d 1271, 1277 (7th Cir.1989). Our approach, however, was just one among many.

The Supreme Court's most recent pronouncement on this issue came in *H.J. Inc. v. Northwestern Bell Telephone Co.*, — U.S. —, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989). In that case, the Court was presented with the issue of whether RICO's "pattern" requirement requires a plaintiff to prove the existence of more than one scheme. The Court concluded that it did not. In so doing, the Court took the opportunity to make some general observations concerning what will now be required to establish the existence of a "pattern" for purposes of the RICO statute. Largely reaffirming the position earlier taken in *Sedima*, the Court stated, "a plaintiff or prosecutor must show that the racketeering predicates are related, *and* that they amount to or pose a threat of continued criminal activity." *Id.* at —, 109 S.Ct at 2900 (emphasis in original).

■ Predicate acts are related if they have "the same or similar purposes, re-

---

5. Under 18 U.S.C. § 1961(1), "racketeering activity" is defined to include, *inter alia,* any act which is indictable under 18 U.S.C. § 1341 (mail fraud), 18 U.S.C. § 1343 (wire fraud) or 18 U.S.C. § 1951 (interference with commerce, robbery or extortion).

sults, participants, victims or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *Id.* at ——, 109 S.Ct. at 2901 (quoting 18 U.S.C. § 3575(e)); *see also Morgan*, 804 F.2d at 975 ("[r]elationship implies that the predicate acts were committed somewhat closely in time to one another, involve the same victim, or involve the same type of misconduct"). If "relationship" were the only prerequisite to the existence of a "pattern" for purposes of RICO, UST's allegations would clearly support a determination that Busch engaged in a pattern of racketeering activity. The "relationship" of the predicate acts one to another does not, however, by itself define a "pattern" for purposes of RICO. "To establish a RICO pattern it must also be shown that the predicates themselves amount to, or that they otherwise constitute a threat of, *continuing* racketeering activity." *H.J. Inc.*, —— U.S. at ——, 109 S.Ct. at 2901 (emphasis in original). The rather amorphous concept of "continuity" was defined by the Court in *H.J. Inc.* as "both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." *Id.* at ——, 109 S.Ct. at 2902. Precisely what this latter phrase means, however, is not clear. As Justice Scalia points out in his concurrence in *H.J. Inc.*:

Virtually all allegations of racketeering activity, in both civil and criminal suits, will relate to past periods that are 'closed' (unless one expects plaintiff or the prosecutor to establish that the defendant not only committed the crimes he did, but is still committing them), and all of them *must* relate to conduct that is 'repeated,' because of RICO's multiple-act requirement.

*Id.* at ——, 109 S.Ct. at 2907 (emphasis in original). Nevertheless, we are left to derive meaning from the guidance provided by the Court on this already elusive issue.

We do not, however, write on a clean slate. In both *Sutherland v. O'Malley*, 882 F.2d 1196 (7th Cir.1989) and *Management Computer Serv. v. Hawkins, Ash,*

*Baptie & Co.*, 883 F.2d 48 (7th Cir.1989), this court has addressed the "pattern" requirement of the RICO statute in light of the Court's decision in *H.J. Inc.* In *Management Computer*, we noted that a general principle which may be derived from *H.J. Inc.* is that, "Congress intended 'a natural and commonsense approach to RICO's pattern element,' [*H.J., Inc.*] *id.* at ——, 109 S.Ct. at 2899, and that 'Congress was concerned in RICO with long-term criminal conduct,' [*H.J. Inc.*] *id.* at ——, 109 S.Ct. at 2902." *Management Computer*, 883 F.2d at 51; *see also, Marshall–Silver Constr. Co., Inc. v. Mendel*, 894 F.2d 593, 596–97 (3d Cir.1990) (focusing on a "natural and common sense" approach to the pattern element of RICO). Specifically addressing the "continuity" element of the pattern requirement in *Sutherland*, we stated:

The Court has not formulated any general test for continuity in the abstract. Instead, the specific facts of each case must be examined to determine whether the predicate acts relied upon by the plaintiff establish a threat of continuing racketeering activity.

882 F.2d at 1204. Both of these decisions indicate that this circuit will still look to the factors identified in *Morgan* in determining whether a "pattern" sufficient to support a RICO claim has been alleged. The impact of the Court's decision in *H.J. Inc.*, beyond its express holding that two schemes need not be shown to prove a "pattern", is that we now analyze these various factors with an eye towards achieving a "natural and common sense" result. *See H.J. Inc.*, —— U.S. at ——, 109 S.Ct. at 2907 ("the Court does little more than repromulgate [the 'continuity' and 'relationship' test], though with the caveat that Congress intended that [it] be applied using a 'flexible approach'") (Scalia, J., concurring).

■ The first *Morgan* factor is the number and variety of predicate acts and the length of time over which they were committed. UST alleges a scheme which lasted from December of 1980 through April of 1982 involving a considerable number (we do not know how many) instances of mail

and wire fraud. At first glance, it would seem from the duration of the scheme and the number of predicate acts that this factor, by itself, would mandate a conclusion that a "pattern" has been alleged. *See H.J. Inc.,* —— U.S. at ——, 109 S.Ct. at 2902. We have previously noted, however, that allegations of mail fraud and wire fraud are unique among predicate acts when it comes to determining the existence of a RICO pattern. As we recently reiterated in *Sutherland*:

> Mail fraud and wire fraud are perhaps unique among the various sorts of 'racketeering activity' possible under RICO in that the existence of a multiplicity of predicate acts ... may be no indication of the requisite continuity of the underlying fraudulent activity. Thus, a multiplicity of mailings does not necessarily translate into a 'pattern' of racketeering activity.

882 F.2d at 1205 n. 8 (quoting *Lipin Enterprises v. Lee,* 803 F.2d 322, 325 (7th Cir. 1986) (Cudahy, J., concurring)); *see also Ashland Oil,* 875 F.2d at 1278 ("number of [mail fraud and wire fraud] offenses is only tangentially related to the underlying fraud, and can be a matter of happenstance"). In this case, each allegation of mail fraud and wire fraud apparently relates back to the extortion allegedly achieved by the December, 1980 contract.[6] Indeed, the economic injury which UST alleges, although it may have been felt over the course of the two years immediately following the December 1980 contract, stems from and was complete at the time that UST agreed to assume the cost of the $2.55 million inventory shortage. Under these circumstances, we believe that the raw number of transactions and the length of time over which those transactions occurred was pure happenstance in light of the underlying concern which is the "continuity" of the criminal activity. A similar

observation prompted the third circuit in *Marshall–Silver* to conclude that a "pattern" for purposes of RICO had not been established. That court stated:

> Virtually every garden-variety fraud is accomplished through a series of wire or mail fraud acts that are 'related' by purpose and spread over a period of at least several months. Where such a fraudulent scheme inflicts or threatens only a single injury, we continue to doubt that Congress intended to make the availability of treble damages and augmented criminal sanctions dependent solely on whether the fraudulent scheme is well enough conceived to enjoy prompt success or requires pursuit for an extended period of time. Given its 'natural and common sense approach to RICO's pattern element,' we think it unlikely that Congress intended RICO to apply in the absence of a more significant societal threat.

894 F.2d at 597. Applying a "natural and common sense" approach, we like the third circuit think it unlikely that Congress intended the draconian measures of RICO to apply to this allegation of "garden-variety" fraud.

The second factor to which we look in determining the existence of a RICO pattern is the number of victims. While this factor cannot be dispositive of any "pattern" determination, we believe it is highly significant in this case when combined with the other factors. The scheme alleged in this case took over two years to achieve and encompassed an unknown number of alleged acts of mail and wire fraud. Yet, UST is the only victim. Even "single schemes" as contemplated by the Court in *H.J. Inc.* may target multiple victims. *See* —— U.S. at ——, 109 S.Ct. at 2902. Moreover, in light of the fact that our concern in this context is with the alleged "continuity"

---

**6.** As the predicate acts of mail and wire fraud, UST makes vague references to the uses of the phones and wires during the period between December, 1980 and April, 1982. Without directly addressing the issue, we note that it is not clear that UST's allegations in this regard have been pleaded with sufficient specificity. Under Fed.R.Civ.P. 9(b), "the circumstances constitut-

ing fraud ... shall be stated with particularity." *See also New England Data Services, Inc. v. Becher,* 829 F.2d 286, 291 (1st Cir.1987) ("In RICO, the plaintiff must go beyond a showing of fraud and state the time, place and content of the alleged mail and wire communication perpetrating the fraud").

of the criminal acts, we note as significant the fact that UST has given no indication that this is a type of activity in which Busch normally engages or, indeed, that there are other potential Busch victims waiting in the wings. *See Sedima*, 473 U.S. at 496, 105 S.Ct. at 3285 n. 14 (RICO is not aimed at the isolated offender).

In *H.J. Inc.*, the Supreme Court held that a plaintiff or prosecutor need not prove multiple schemes to show a pattern for purposes of the RICO statute. This, however, does not mean that the fact that there is only one scheme involved is of no consequence to the "pattern" determination. To the contrary, "[w]hile a RICO pattern can be established, in some circumstances, by proof of a single scheme, it is not irrelevant, in analyzing the continuity requirement, that there is only one scheme." *Sutherland*, 882 F.2d at 1204; *Menasco*, 886 F.2d at 684. Like the court in *Sutherland*, we are presented with allegations of only one dishonest undertaking—i.e., the extortionate scheme by which Busch allegedly forced UST to assume the responsibility for a $2.55 million inventory shortage. Thus, while we realize that the fact of only a single scheme cannot preclude a finding of a RICO pattern, we do believe it is significant when combined with the other relevant factors in showing a lack of the required "continuity".

Finally, we consider whether the alleged predicate acts brought about the occurrence of distinct injuries. Arguably, UST suffered an economic injury each time Busch ordered and it shipped discounted t-shirts under the terms of the December 1980 contract. The question arises, however, whether each of these injuries was "distinct" in the sense that it signalled, or by itself constituted, a threat of "continuing" criminal activity. We do not believe that it did. Clearly, the duration of the alleged scheme is a factor to be taken into consideration. If the concern is "continuity", however, and the price for that "continuity" is treble damages, costs and reasonable attorneys fees, *see* 18 U.S.C. § 1964, a natural and common sense approach to the pattern element of RICO would instruct that identical economic injuries suffered

over the course of two years stemming from a single contract were not the type of injuries which Congress intended to compensate via the civil provisions of RICO.

We do not believe UST's allegations of extortion, mail fraud and wire fraud rise to the level of a "pattern of racketeering activity" sufficient to support a RICO claim. Our conclusion is not premised solely upon the fact that there was only one scheme; such a premise is forbidden by the Court's decision in *H.J. Inc.* Nor do we premise our conclusion solely upon the fact that UST is the only victim or upon the fact that the injuries which UST has suffered, while arguably distinct, are nevertheless economically identical. Rather, our conclusion is premised upon a "natural and common sense" application of the *Morgan* factors to the facts and circumstances of this case. Simply put, we do not believe that Congress intended RICO to apply to allegations of fraud such as this absent a showing of criminal activity which presents a "more significant social threat". *Cf. Marshall–Silver*, 894 F.2d at 597.

### B. *State Common Law Claims*

All of UST's state common law claims were dismissed by the district court in its Memorandum Opinion and Order dated March 29, 1988. In this appeal, UST argues that the district court's dismissal of Count 8 ("conspiracy to injure business") and Count 14 ("economic duress") were erroneous. We disagree.

#### 1. Conspiracy to Injure Business

■ Because the district court's jurisdiction over the state law claims was premised upon diversity of citizenship, the law of the forum state (Illinois) controlled the choice of which statute of limitations would apply. *Klaxon Co. v. Stentor Electric Mfg. Co., Inc.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1943); *McMahon v. Pennsylvania Life Ins. Co.*, 891 F.2d 1251, 1257 (7th Cir.1989). Applying Illinois' "borrowing statute", Ill.Rev.Stat., ch. 110 ¶ 13–210

(Smith Hurd 1985),[7] the district court concluded that Tennessee's three-year statute of limitations, T.C.A. § 28–3–105, governed UST's claim of "injury to business" and dismissed it upon those grounds.[8] UST argues that the district court erred in applying the three-year statute of limitations in that its claim of "injury to business" is governed in Tennessee by the "catch-all" ten-year statutory limitations period set forth in T.C.A. § 28–3–110(3).

The foundation upon which UST premises its claim in this regard is the Supreme Court's 1906 decision in *Chattanooga Foundry & Pipe Works v. City of Atlanta*, 203 U.S. 390, 27 S.Ct. 65, 51 L.Ed. 241 (1906). *Chattanooga Foundry* involved a claim alleging "injury to business or property" under § 7 of the Sherman Antitrust Act. Because no federal statute of limitations expressly applied to such a claim for treble damages, and because Tennessee did not have a statute of limitations governing "injury to business" as such, the Court affirmed the lower court's decision to borrow Tennessee's residual ten-year statute of limitations to govern this federal claim. In so doing, the Court stated:

> there is a sufficiently clear distinction between injuries to property and 'injured in his business or property,' the latter being the language of the act of Congress. A man is injured in his property when his property is diminished. He would not be said to have suffered an injury to his property unless the harm fell upon some object more definite and less ideal than his total wealth.... But when a man is made poorer by an extravagant bill we do not regard his wealth as a unity, or the tort, if there is one, as directed against that unity as an object.... We say that he has been defrauded or subjected to duress, or whatever it may be, and stop there.

*Id.* at 399, 27 S.Ct. at 67. Contrary to UST's assertions, we do not believe that this language created a doctrine in Tennessee under which "injuries to business" are governed by the residual ten-year statutory limitations period.

That *Chattanooga Foundry* did not establish such a general rule in cases alleging "injury to business" in Tennessee is evident from the fact that UST was unable to cite, and we were unable to find, *any* Tennessee cases in the 84 years since *Chattanooga Foundry* in which that statutory limitations period has been applied to an allegation of "injury to business". Indeed, the cases in Tennessee which have addressed the issue of what limitations period applies to various types of "injuries to business" instruct that T.C.A. § 28–3–110(3) is not the appropriate choice.

In Tennessee, the applicable statute of limitations for any cause of action is determined according to the gravamen of the claim. *Vance v. Schulder*, 547 S.W.2d 927, 931 (Tenn.1977); *Prescott v. Adams*, 627 S.W.2d 134, 137 (Tenn.App.1981). The gravamen of UST's allegation in Count 8 is that Busch conspired through various instances of extortion, mail fraud and wire fraud to injure UST's business. While there are no cases which support UST's assertion that these allegations are governed by the ten-year limitations period, a multitude of Tennessee cases have held that similar tort allegations involving one party's wrongful interference with a second party's business and/or business relationships are governed by § 28–3–105's three-year limitations period.

In *Budget Rent-a-Car of Knoxville, Inc. v. Car Services, Inc.*, 225 Tenn. 342, 469 S.W.2d 360 (1971), the Tennessee Supreme Court was presented with a claim in which the owners of the Budget franchise in Knoxville alleged that the defendants had

---

7. Ill.Rev.Stat., ch. 110 ¶ 13–210 provides:
   Foreign Limitation. When a cause of action has arisen in a state or territory out of this State, or in a foreign country, and, by the laws thereof, an action thereon cannot be maintained by reason of the lapse of time, an action thereon shall not be maintained in this State.

8. Section 28–3–105 provides, in pertinent part:
   The following actions shall be commenced within three (3) years from the accruing of the cause of action:
   (1) Actions for injuries to personal or real property;....

conspired to force them to sell their business. In the process of ruling on the issues presented therein, the court expressly held that the complainants' tort allegations —i.e., the alleged conspiracy which forced them to sell their business—were governed by the three-year statutory limitations period set forth in T.C.A. § 28-3-105.

More recently, in *Dorsett Carpet Mills, Inc. v. Whitt Tile & Marble Distributing Co.*, slip op., 1986 WL 622 (Tenn.App. Jan. 2, 1986), *aff'd in part, rev'd in part*, 734 S.W.2d 322 (Tenn.1987), Whitt Tile brought a counterclaim against Dorsett in which it alleged fraudulent inducement of breach of contract, conspiracy, and wrongful interference with business. Judgment was entered in favor of Whitt Tile on its counterclaim. In affirming that judgment, the Tennessee appellate court noted that T.C.A. § 28-3-105's three-year limitations period governed Whitt's allegations. *See also Harvest Corp. v. Ernst & Whinney*, 610 S.W.2d 727 (Tenn.App.1980) (suits in which fraud, deceit or conspiracy are alleged are actions in tort and are governed by § 28-3-105).

As we pointed out before, the gravamen of UST's claim in Count 8 is that Busch conspired through various acts of mail fraud, wire fraud and extortion to injure UST's business. Thus, the damage alleged is injury to business and the means by which that damage was allegedly achieved are conspiracy and fraud. In this regard, we fail to see how UST's claim is any different from the conspiracy to injure business claim brought by the complainant in *Budget Rent-a-Car* which the Tennessee Supreme Court expressly held was governed by the three-year limitations period found in T.C.A. § 28-3-105. In light of this Tennessee Supreme Court precedent and the absence of any modern authority instructing to the contrary, we reject UST's argument that a general "injury to business" doctrine exists in Tennessee mandating the application of T.C.A. § 28-3-110(3)'s residual ten-year limitations period.

In the alternative, UST argues that any applicable statute of limitations on its common law claims was tolled by the duress Busch allegedly exercised over UST in the negotiation and execution of the December, 1980 contract. Because UST did not raise this argument before the district court, the argument has been waived and we need not consider its merit. *Gray v. Lacke*, 885 F.2d 399, 409 (7th Cir.1989), *cert. denied*, —— U.S. ——, 110 S.Ct. 1476, 108 L.Ed.2d 613 (1990); *Zbaraz v. Hartigan*, 763 F.2d 1532, 1544 (7th Cir.1985).

2. Economic Duress

In dismissing UST's "economic duress" claim, the district court stated, "[i]t is not clear whether this is a tort claim or a contract claim since plaintiff has not cited any published Tennessee law (nor the law of any other state) to establish that it has a valid claim. The court therefore holds that plaintiff does not have an actionable claim." Because we conclude the allegation of Count 14 is grounded in tort, and because such an allegation under Tennessee law is governed by the three-year limitations period set forth in T.C.A. § 28-3-105, we affirm the district court's dismissal of Count 14, albeit on different grounds.

As a general rule, a party who has been induced through duress to enter into an agreement or contract may pursue one of two remedies; he may seek rescission of the agreement in an equitable proceeding or he may affirm the contract and sue for damages at law. *Solomon v. Flo-Warr Management, Inc.*, 777 S.W.2d 701, 705 (Tenn.App.1989) (applying Alabama law); *see also Vance*, 547 S.W.2d at 931 (same options available to one "fraudulently induced" into entering into a contract); *Cureton v. Oberman*, CA No. 1339, 1990 WL 97841 (Tenn.App. July 17, 1990); *Williamson v. Upchurch*, 768 S.W.2d 265, 271 (Tenn.App.1989); *Crocker v. Schneider*, 683 S.W.2d 335, 338-39 (Tenn.App.1984). UST has not expressly asked either this court or the district court to set aside the December, 1980 contract.[9] Rather, UST

9. The fact that UST did not seek such equitable relief in Count 14 is understandable in light of

opted to bring an action at law to recover damages which have precipitated from the alleged economic duress. In its brief before this court, UST styles its claim in Count 14 as follows:

> Count Fourteen is not a 'claim that the December 4, 1980 discount agreement was obtained through economic duress'. Count Fourteen does not limit itself to economic duress in obtaining the December 4, 1980 'agreement.' It is much more expansive. The reference is to the 40% discount scheme, which the complaint alleges to be a 19% out-of-pocket loss to UST and $1,800,000 loss of income.

Having styled its claim as such, the question necessarily arises whether this claim is grounded in tort or contract law. The district court raised this question without answering it. UST has neglected in this appeal to clear up the confusion. Nevertheless, in light of the Tennessee Supreme Court's resolution of an almost identical issue in *Vance v. Schulder*, we conclude that UST's action for damages is grounded in tort and, as such, is time barred by Tennessee's three-year limitations period.

In *Vance*, the plaintiff brought an action seeking monetary damages against various defendants alleging that they had fraudulently induced him to sell his stock for less than its value. The Tennessee Supreme Court was asked to determine which of the various Tennessee statutory limitations periods was applicable. The choices presented to the court included, among others, the three-year limitations period governing tortious property damage claims, T.C.A. § 28–3–105, and the six-year limitations period for contracts as prescribed by T.C.A. § 28–3–109. Concluding that the former was appropriate, the court stated, "[a]n individual induced by fraud to enter into a contract may sue for the equitable remedy of rescission or he may treat the contract as existing and sue for damages at law under a theory of 'deceit.' The latter is grounded in tort." 547 F.2d at 931.

The difference between the action brought in *Vance* and that which is presented for our review today is that UST has alleged "economic duress" rather than "deceit". This, however, is a distinction without meaning in the specific context of determining the appropriate limitations period under Tennessee law. UST, rather than seeking the rescission of the agreement in an equitable proceeding, brought an action at law to recover the damages which resulted from alleged improper conduct in the negotiation of a commercial transaction. The decision in *Vance* instructs that such a claim is governed by T.C.A. § 28–3–105's three-year limitations period. Because UST did not file its claim until six years after the formation of the contract and four years after the last shipment of discounted t-shirts, we conclude that Count 14 is time-barred.

### III.

For all of the foregoing reasons, we AFFIRM the district court's dismissal of UST's RICO and common law claims.

---

the six-year delay which UST allowed before filing suit. In Tennessee, a party wishing to set aside a contract must do so within a reasonable period after the grounds for rescission become apparent. "It is a settled rule that the right to rescind a contract for fraud must be exercised immediately upon its discovery, and that any delay in doing so, and the continued employment, use, and occupation of property received under a contract will be deemed an election to confirm it." *Russell v. Zanone,* 55 Tenn.App. 690, 404 S.W.2d 539, 544–45 (1966) (quoting *Landreth v. Schevenel,* 102 Tenn. 486, 493, 52 S.W. 148, 149 (1899)); *see also Valley Fidelity Bank & Trust Co. v. Cain Partnership, Ltd.,* 738 S.W.2d 638, 640 (Tenn.App.1987); *Crocker,* 683 S.W.2d at 340; *Williams v. Spinks,* 7 Tenn.App. 488, 493 (1929) (a party may lose his right to rescind a contract by not availing himself of his right within a reasonable time after discovering the fraud). Thus, even if UST's prayer was one for rescission, we would affirm the dismissal of Count 14 on these grounds.