**OLIVE CAN CO., INC., et al.,**
**Plaintiffs–Appellants,**

v.

**Jacob MARTIN, Jonathan Martin, and D.C.S. Corporation, f/k/a Delicious Cookie Sales Company, Inc., Defendants–Appellees.**

No. 89–3319.

United States Court of Appeals,
Seventh Circuit.

Argued May 16, 1990.

Decided July 11, 1990.

As Amended July 13, 1990.

1148

Barry Sullivan, Larry M. Wolfson, Jenner & Block, Chicago, Ill., Michael Palmer, Middlebury, Vt., for plaintiffs-appellants.

James P. Chapman, Alan S. Mills, Chapman & Associates, Chicago, Ill., for defendants-appellees.

Before WOOD, Jr., and FLAUM, Circuit Judges, and CRABB, Chief District Judge.*

FLAUM, Circuit Judge.

Six creditors of Delicious Cookie Company ("Delicious Cookie" or the "Company") brought this action to recover approximately $354,000 for goods sold to the Company. The plaintiffs alleged that defendants Jacob Martin and Jonathan Martin, owners and officers of Delicious Cookie, violated RICO, 18 U.S.C. § 1961 *et seq.*, when they set up a sham corporation whose existence they concealed from the plaintiffs, in order to divert to Jacob Martin substantial sums of money that otherwise would have been available to satisfy the Company's obligations to the plaintiffs. The district court granted summary judgment to the defendants on their RICO claim, finding that the undisputed facts established that the defendants had not engaged in a pattern of racketeering activity and dismissed the remaining pendent claims. We affirm.

---

* The Honorable Barbara B. Crabb, Chief Judge of the United States District Court for the Western District of Wisconsin, is sitting by designation.

## I.

In the early 1980's, Delicious Cookie manufactured and sold cookies which were designed to be given as gifts during the Christmas season. It was wholly owned by Jonathan Martin, given to him by his father Jacob. Jacob and Jonathan were the sole directors and officers of the company.

In early–1983 Delicious Cookie found itself in severe financial distress. In April, Aetna Bank, one of its creditors, demanded that Delicious Cookie repay a working capital loan of approximately $170,000. Delicious Cookie was unable to repay this obligation. The Company also had an outstanding loan of $365,000 from Jacob Martin. These obligations were all the more burdensome since the Company needed additional capital to produce cookies for the upcoming holiday season; with Aetna Bank holding a priority interest in all of Delicious Cookie's assets, financing was difficult to obtain.

To provide the necessary infusion of capital, Jacob Martin agreed to lend additional funds to Delicious Cookie if the company would provide him with a security interest. Recognizing the need to circumvent Aetna Bank's priority interest in Delicious Cookie's assets, Jacob Martin created Delicious Cookie Sales Corporation ("DCS"), purportedly to serve as Delicious Cookie's "selling arm." According to the written agreement between Jacob Martin and Delicious Cookie concerning the formation of the new entity, DCS was to purchase Delicious Cookie's inventory with funds advanced by Jacob Martin and secured by DCS's assets. DCS would sell the product to customers and pay Jacob Martin out of the revenue derived from these sales. Between August and October 1983, Jacob Martin transferred approximately $550,000 to DCS pursuant to the agreement. DCS had no employees, no payroll, no stationery, and no profit margin. Jacob Martin was the sole shareholder and only director of DCS.

After the Martins created and funded DCS, they prepared Delicious Cookie for its baking season by purchasing merchandise on credit from the plaintiffs, who were suppliers of materials used for cookie production. The plaintiffs were not told by Delicious Cookie or the Martins of DCS or Jacob Martin's secured interest in DCS. Unaware of these important facts, the plaintiffs collectively sold to Delicious Cookie $307,996 worth of cookie ingredients. With these ingredients in hand, Delicious Cookie produced cookies during the Fall of 1983 and Spring of 1984.

Delicious Cookie's continued poor financial health, however, led Jonathan Martin to request extended payment terms from each of the plaintiffs during the summer and fall of 1983. He explained to the plaintiffs that Delicious Cookie suffered cash flow difficulties because its customers were primarily fundraisers who did not pay for the cookies until they received payment from their customers. He promised to pay the plaintiffs as soon as Delicious Cookie received revenues from the fundraisers. The plaintiffs were still not informed of the arrangement with DCS. Eventually, the plaintiffs were told of Jacob Martin's loan to DCS, but they were not informed that Jacob Martin would receive priority in payment or that Jacob Martin had received repayments from DCS on his loan.

Although Delicious Cookie sold over two million dollars worth of cookies during the 1983–84 season, the Company was unable to repay all of its obligations. These defaults spurred three of the original plaintiffs in this lawsuit to file an involuntary bankruptcy petition against Delicious Cookie. In March 1985, the bankruptcy court declared Delicious Cookie bankrupt.

Rather than further pursuing their claims in the bankruptcy court, however, the plaintiffs opted to bring this action for state law fraud and RICO violations. 18 U.S.C. § 1961 *et seq.* They alleged that the use of DCS to provide Jacob Martin with additional security was fraudulent, and that Jonathan Martin made affirmative misrepresentations to and concealed material facts from the plaintiffs in furtherance of the scheme to defraud in violation of RICO. The sole basis for federal jurisdiction was RICO.

After five years of discovery, the defendants moved for summary judgment argu-

ing that the plaintiffs could not show that Jonathan Martin had misrepresented facts to induce the plaintiffs to continue supplying merchandise on credit. The district court denied the motion, finding that "the evidence suggests that Jonathan Martin made false promises and misrepresentations to the plaintiffs concerning the payment of Delicious Cookie's trade debt."[1]

On a motion to reconsider, the defendants argued that in light of the Supreme Court's intervening decision in *H.J. Inc. v. Northwestern Bell*, ── U.S. ──, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989), the plaintiffs would be unable to show at trial that the defendants engaged in a pattern of racketeering activity. The district court granted summary judgment based on this motion, relying on the Supreme Court's statement in *Northwestern Bell* that "predicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy [the pattern] requirement...." Finding that the fraudulent activity here was limited to the last six months of 1983, the district court concluded that the scheme was closed-ended and there was no threat of continuing racketeering activity. It concluded that the scheme was a "single, short-lived attempt to achieve a single purpose in a finite period of time." As such, the court found no pattern of racketeering activity and granted summary judgment. The pendent state claims were also dismissed, and the plaintiffs appeal.

## II.

The plaintiffs raise three arguments on appeal. Their primary claim is that despite *Northwestern Bell*, the defendants' alleged fraudulent activities satisfy the pattern requirement of RICO. They also argue that they should be allotted more time for discovery on the pattern requirement and that the pendent counts should not have been dismissed.

 We turn first to the pattern requirement. Under the RICO statute, a pattern of racketeering activity consists of at least two predicate acts of racketeering committed within a ten-year period. 18 U.S.C. § 1961(5). Merely alleging two predicate acts, however, does not satisfy the pattern requirement. *Sedima S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 n. 14, 105 S.Ct. 3275, 3285 n. 14, 87 L.Ed.2d 346 (1985). To establish a pattern, the plaintiff must prove continued criminal activity or a threat of continued activity (the continuity element), and a relationship between the predicate acts (the relationship element). *Id.*

In *Northwestern Bell*, the Supreme Court confirmed the "continuity plus relationship" test of *Sedima*. The Court considered and rejected a requirement that the defendants engage in multiple schemes to satisfy the pattern requirement. "[I]t is implausible to suppose that Congress thought [a pattern] may be shown *only* by proof of multiple schemes." *Northwestern Bell*, 109 S.Ct. at 2901. "RICO's legislative history reveals Congress' intent that to prove a pattern of racketeering activity a plaintiff or prosecutor must show that the racketeering predicates are related, *and* that they amount to or pose a threat of continued criminal activity." *Id.* at 2900. "It is this factor, *continuity plus relationship*, which combines to produce a pattern." *Id.*

 The district court held that the undisputed evidence established that the continuity element of the pattern requirement, as delineated in *Northwestern Bell*, was not satisfied. The Supreme Court stated in *Northwestern Bell* that " '[c]ontinuity' is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." *Id.* at 2902. "A par-

---

1. The defendant's brief is largely devoted to proving that they were guilty of no misrepresentations constituting wire and mail fraud. Review of the district court's original denial of summary judgment, however, is not before us. The district court initially held that the plaintiffs had put forth sufficient evidence to prove their claims of fraud and misrepresentation and did not revisit this finding in the motion for reconsideration which was based solely on the pattern requirement. We, therefore, analyze the RICO claims assuming these allegations are true.

ty alleging a RICO violation may demonstrate continuity over a closed period by proving a series of related predicates extending over a substantial period of time. Predicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement." *Id.* Alternatively, a party may prove a pattern of racketeering activity by proving a "specific threat of repetition extending indefinitely into the future" or that the "predicate acts or offenses are part of an ongoing entity's regular way of doing business." *Id.* at 2902. No one factor is determinative; rather, courts must examine the facts of each case to determine when the threat of long term criminal activity is present. Applying this analysis, the district court determined that *Northwestern Bell* mandated summary judgment for the defendants because their activities were closed-ended over a short period of time with no threat of ongoing activity. Accordingly, the district court found no pattern of racketeering activity and granted summary judgment for the defendants.

We agree with the district court. Our decision is based primarily on the undisputed evidence that the purpose of the allegedly fraudulent scheme was to pay Jacob Martin's loan. The scheme, therefore, had a natural ending with no threat of continued criminal activity. This single scheme was to be short-lived and there is no evidence that, had the scheme worked, it would have been repeated in the future. There is, therefore, no "specific threat of repetition," nor has there been a showing that the predicate acts are part of the defendants' "regular way of doing business." *Northwestern Bell,* 109 S.Ct. at 2902. Consequently, the continuity element of the pattern requirement is not satisfied.

Our conclusion is buttressed by application of this Court's multifactor test for continuity outlined in *Morgan v. Bank of Waukegan,* 804 F.2d 970, 975 (7th Cir.

1986). In that case, we adopted a flexible approach to determine continuity, similar to the one used in *Northwestern Bell.* We held that "relevant factors [for finding continuity] include the number and variety of predicate acts and the length of time over which they were committed, the number of victims, the presence of separate schemes and the occurrence of distinct injuries." [2] *Id.* In our case, while there were a large number of predicate acts, they were not of great variety. There were a number of victims (each of the plaintiffs) but there was only a single scheme.[3] Moreover, the acts were committed over a short period of time and the evidence indicates that they would have ended after a short period of time had suit not been brought. On balance, we believe that the plaintiffs have not established that these factors point towards continuity. Moreover, in light of *Northwestern Bell's* emphasis on the threat of continued racketeering activity, we cannot conclude that a pattern has been established.

The plaintiffs claim that this case is substantially identical to a pre-*Northwestern Bell* case, *Ashland Oil Inc. v. Arnett,* 875 F.2d 1271 (7th Cir.1989), where we affirmed a jury finding of a pattern of racketeering activities. In that case, the plaintiffs brought a RICO suit against a petroleum wholesale corporation who induced the plaintiffs to extend credit by mailing a false financial statement showing the company to be in sound financial condition when it was not. The defendants' alleged objective was to expand the company's assets at the expense of the plaintiffs, and then to funnel those assets or their proceeds to themselves through intermediary corporations. The defendants furthered their scheme by burning records and committing fraud on a bankruptcy court to prevent discovery. We held that the continuity element of the pattern requirement was satisfied in that case because the de-

---

**2.** While this case was decided prior to *Northwestern Bell,* our multifactor test was, in large part, confirmed by *Northwestern Bell* and is still relevant. *Management Computer Services, Inc. v. Hawkins Ash, Baptie,* 883 F.2d 48, 51 (7th Cir.1989).

**3.** This is not to suggest that there is no case that satisfies RICO's requirements in which a large number of plaintiffs were defrauded in the same manner as part of a single scheme.

fendant's actions harmed four different victims through a variety of predicate acts. While the acts took place over only a four month period, we found that this time period was sufficient when viewed in light of the other evidence of continuity.

The plaintiffs argue that *Ashland Oil* controls our outcome. We agree that *Ashland Oil* is facially similar to the case before us. Like that case, the defendants' actions harmed four different victims, with several injuries flowing from different acts committed at different times. In addition, the alleged purpose behind the defendants' actions in both cases was arguably the same: both sets of defendants sought to "expand the company's assets at the expense of the plaintiffs, and then to funnel those assets or their proceeds to themselves through [an] intermediary also owned and controlled by them." 875 F.2d at 1272. In fact, the predicate acts in this case took place over a longer period of time than the predicate acts in *Ashland Oil.*

Nevertheless, we conclude that *Ashland Oil* is not controlling. The defendants in *Ashland Oil* committed arson and bankruptcy fraud in addition to mail and wire fraud. The arson consisted of the burning of records to prevent the discovery of the fraud and the bankruptcy fraud was also to prevent discovery. These acts, therefore, are indicative of a threat of continued activity and the absence of similar acts in our case we find relevant. In addition, the frauds in *Ashland* did not have an obvious stopping point. It was reasonable for a jury to conclude from the nature of those acts that defendants viewed the fraud as more than a one-time activity; they were in the business of stealing money, not in the business of paying back a concealed business debt for a fixed amount. In sum, *Ashland Oil* is not dispositive of this case because there, the jury could conclude that the specific predicate acts indicated an intent to continue the fraud indefinitely and the scheme was, therefore, open-ended; here, the repayment scheme had a closed-ended goal with no predicate acts suggesting an intent to continue the alleged fraud beyond its relatively short term.

The plaintiffs also argue that the district court placed too much emphasis on the language in *Northwestern Bell* that "[p]redicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy [the pattern] requirement. 109 S.Ct. at 2902. They argue that requiring them to prove conduct continuing over more than a few months would require them to prove fraudulent acts after they filed their complaint, which was only a few months after the activity began. The Supreme Court, however, provided for the event that the perpetrators may be caught before the scheme is completed: "Often a RICO action will be brought before continuity can be established [by showing racketeering activity continued over a substantial period of time]. In such cases, liability depends on whether the *threat* of continuity is demonstrated." *Id.* The plaintiffs have not shown the threat of continued activity because there is no evidence that the scheme would continue after Jacob Martin was repaid. In essence, the activities of the defendants were to effectuate a single, short-term goal: giving Jacob Martin a security interest in the proceeds of the sales of Delicious Cookies without notifying their secured lender or their trade creditors. We conclude that the activity in this case does not "amount to or threaten long-term criminal activity" that is targeted by the RICO pattern requirement. *Id.* at 2902 n. 4.

### III.

The plaintiffs argue in the alternative that we should remand the case for further discovery on the pattern issue because Jacob Martin refused, during his deposition, to answer questions regarding his personal affairs other than those related to the transactions at issue in the suit. Our standard of review for the district court's decision not to allow additional pre-trial discovery is abuse of discretion. *Dole v. Local 1942, International Brotherhood of Electrical Workers,* 870 F.2d 368 (7th Cir. 1989). We cannot conclude that the district court abused its discretion in denying further discovery at this late stage in the proceedings. Discovery in this case took

place over five years. More than a dozen depositions have been taken, including those of Jonathan Martin over a three day period and Jacob Martin over an additional three days. Until the motion to reconsider, the plaintiffs never raised in court Jacob Martin's refusal to answer questions on this issue although discovery continued for three years after his deposition. *Sedima* was decided long before the motion to reconsider and the plaintiffs were on notice that they had to confront the continuity element.

■ Finally, the plaintiffs argue that the district court abused its discretion in dismissing the pendent counts just before trial after five years of discovery. We disagree. The normal course of action where a district court disposes of the federal claims before trial is to dismiss the pendent claims. "When the federal claims are disposed of before trial, the state claims should be dismissed without prejudice almost as a matter of course." *Baltimore Orioles, Inc. v. Major League Baseball Players Assoc.*, 805 F.2d 663, 682 (7th Cir. 1986). The plaintiffs point to no extraordinary circumstances justifying a departure from this principle and we cannot conclude that the district court abused its discretion.

The decision of the district court is AFFIRMED.