**SHIELDS ENTERPRISES, INC., Plaintiff,**

v.

**FIRST CHICAGO CORPORATION, First National Bank of Chicago, First Capital Corporation of Chicago, First Chicago Investment Corporation, and Richard C. Gallagher, Defendants.**

No. 86 C 10213.

United States District Court, N.D. Illinois, E.D.

April 16, 1991.

Stephen Novack, Kenneth S. Schlesinger, Novack and Macey, Chicago, Ill., for plaintiff.

Peter J. Kilchenmann, Lynn A. Goldstein, Cynthia H. Hyndman, The First Nat. Bank of Chicago, Dan K. Webb, Scott Szala, Winston & Strawn, Kevin E. White, Chicago, Ill., for defendants.

**1.** *See* Tab 11 of Plaintiff's Supplemental Appendix, ¶ 5.

## MEMORANDUM OPINION AND ORDER

HOLDERMAN, District Judge:

Defendants in this case, First Chicago Corporation, First National Bank of Chicago ("First Bank"), First Capital Corporation of Chicago, First Chicago Investment Corporation, and Richard C. Gallagher, have moved for summary judgment on the remaining counts of the amended complaint of plaintiff Shields Enterprises, Inc. ("SEI"). For the reasons stated below, defendants' motion must be granted.

### I.  BACKGROUND FACTS

The facts of this lawsuit concern the ownership and sale of shares of a corporation called Cellular Business Systems, Inc. ("CBSI").

In the spring of 1983, SEI, Martin Cooper, and Arlene Harris formed CBSI. CBSI was a non-public corporation which specialized in computer billing services for the growing cellular telephone business. In exchange for cash and services, SEI, Mr. Cooper and Ms. Harris each acquired one-third of the outstanding stock of CBSI.

On June 8, 1984 the three CBSI shareholders entered into various agreements, one of which required the unanimous consent of all shareholders for any transfer or sale of CBSI stock ("Stockholders' Agreement"). The Stockholders' Agreement also gave first CBSI, and then each shareholder, a right of first refusal in the event another shareholder received an offer to buy his or her shares.[1]

CBSI experienced rapid success. It soon became apparent that CBSI could, with a large capital infusion, command a large portion of the market for cellular telephone billing services. In 1984 First Bank expressed an interest in investing in CBSI. Until First Bank could proceed with plans for a larger investment, however, it provided interim financing to CBSI through a series of loans totalling $1.2 million.

In March of 1985 the First Chicago defendants[2] agreed with SEI, Mr. Cooper and

**2.** As the defendants have in their briefs, the court occasionally shall use the term "First Chi-

Ms. Harris to make an $8 million equity investment in CBSI—an investment which would result in First Capital becoming a majority shareholder of a restructured CBSI. Under a reorganization agreement signed by the parties on March 28, 1985, SEI, Mr. Cooper, and Ms. Harris contributed their CBSI stock to a corporation named Technology Group, which held their CBSI stock.

In exchange for contribution of their stock, SEI, Mr. Cooper, and Ms. Harris each received a one-third ownership interest in Technology Group. Pursuant to a written agreement, the three owners of Technology Group agreed that they would not sell Technology Group's CBSI stock without the unanimous consent of all three. The March 28, 1985 agreements also incorporated the parties' June 8, 1984 Stockholders' Agreement. One result of this incorporation was that first Technology Group, and then each shareholder, had a right of first refusal in the event another shareholder received an offer to buy his or her interest in the shares of CBSI held by Technology Group.[3]

CBSI experienced significant growth throughout the summer and fall of 1985. According to defendants, however, despite this growth, from March of 1985 through June of 1986 CBSI encountered severe management and operational problems, as well as fiscal problems.

In late October of 1985 defendants planned to infuse $2 million in capital into CBSI. According to plaintiff, in an October meeting defendants stated that they would refuse to allow Technology Group to participate in the capital infusion.[4] Instead, defendants insisted on purchasing all of the additional $2 million stock themselves at a price of $4 per share. According to plaintiff, because they feared dilution of their interest in CBSI, SEI, Mr. Cooper and Ms. Harris desired to share in

the purchase of the new CBSI shares to be issued.

In mid-December of 1985 defendants and Technology Group purchased the new CBSI shares together. The shares were purchased for $4 per share, and in amounts which would maintain the parties' proportionate interests in CBSI (approximately 54.5% for defendants and 45.5% for Technology Group). Plaintiff contends, however, that defendants "forced" Technology Group to make its almost $1 million capital contribution by threatening to dilute Technology Group's interest in CBSI by purchasing all new shares at the "artificially low price" of $4 per share. (Amended Complaint, ¶¶ 25–26.)

In late March of 1986, Richard Gallagher replaced a gentleman named Scott Marks as the primary First Bank representative overseeing the bank's CBSI investment. On March 26, 1986 Mr. Gallagher became a member of CBSI's board of directors.

Ultimately, Mr. Cooper, who had been acting as the Chief Executive Officer and Chief Operating Officer of CBSI, decided he wanted to sell CBSI. According to plaintiff, Mr. Cooper wanted to sell CBSI because defendants had threatened to dilute his interest in CBSI.

In the last quarter of 1985 Mr. Cooper met with John T. LaMacchia, president of Cincinnati Bell, about a possible sale of CBSI to Cincinnati Bell. In March of 1986 Mr. Cooper again discussed with Cincinnati Bell the possibility of selling CBSI.

At about the same time, Mr. Cooper informed defendants of his belief that CBSI was about to lose one of its key customers, Metromedia, Inc., which accounted for 25% of CBSI's business and revenues. Around this time, defendants also learned of Mr. Cooper's negotiations with Cincinnati Bell about a possible sale of CBSI.

On April 17, 1986, Mr. LaMacchia and other representatives of Cincinnati Bell met

---

cago defendants" to refer to some but not necessarily all of the defendants in this action.

**3.** See DX 58, Exhibit B, attached as Tab 17 to Def. Appendix to Joint Motion for Summary Judgment.

**4.** See Shields Dep. at 333–339.

with Mr. Shields, Mr. Cooper, and Mr. Gallagher. They discussed the possible sale of CBSI to Cincinnati Bell.

On April 29, 1986, SEI, Mr. Cooper, Ms. Harris, First Capital and First Investment entered into an Allocation Agreement. The Allocation Agreement structured how the payments from Cincinnati Bell would be distributed to CBSI's shareholders in the event the sale occurred. Mr. Shields signed that agreement. According to Mr. Shields, however, he believed the Allocation Agreement to be conditional only, and to not create any binding obligation to later agree to the sale of CBSI to Cincinnati Bell.

The Allocation Agreement provided that of the $13 million Cincinnati Bell was to pay to CBSI shareholders at closing, First Capital/First Investment would receive $10 million and Technology Group would receive $3 million. After closing, Cincinnati Bell would make contingent cash payments of approximately $7 million, to be divided approximately 25% to First Capital/First Investment and 75% to Technology Group.

According to Mr. Shields, despite his signing of the Allocation Agreement, he objected both to the price and to the sale of CBSI to Cincinnati Bell. Mr. Shields claims he signed the Allocation Agreement merely to "buy time" to convince Mr. Cooper that Metromedia would not be lost as a CBSI customer.

On April 25, 1986 Mr. Shields allegedly telephoned Mr. Cooper to inquire about a possible purchase of Mr. Cooper and Ms. Harris' interest in Technology Group. According to plaintiff, faced with both SEI's offer to buy Mr. Cooper's and Ms. Harris' stock and Mr. Shield's objections to the sale of CBSI to Cincinnati Bell, defendants engaged in threats to prevent Mr. Cooper and Ms. Harris from selling to SEI. Defendants did so to accomplish their goal of "forcing" the sale of CBSI to Cincinnati Bell.

Specifically, plaintiff offers evidence that Don Kilpatrick, a First Bank vice-president who assisted on CBSI matters, had stated that if SEI refused to go along with the sale of CBSI to Cincinnati Bell, defendants

would take several actions. Defendants would, in essence, dilute the CBSI stock. Defendants would replace CBSI's management. And defendants would terminate a consulting contract between Mr. Shields and SEI.

On May 28, 1986 Mr. Shields and his attorney met with Mr. Cooper and Robert Schwimmer, a member of the board of directors of CBSI who had been nominated to the board by Technology Group. At that meeting Mr. Shields again sought to purchase the interests of Mr. Cooper and Ms. Harris in CBSI.

According to plaintiff, SEI was simply exercising its right of first refusal under the Stockholders Agreement governing the relationship among SEI, Mr. Cooper and Ms. Harris. Under plaintiff's version of the facts, Mr. Cooper feared that if he sold his stock to plaintiff, defendants would carry through on their threats to dilute CBSI's stock, to replace CBSI's management, and to terminate consulting contracts with plaintiff. On May 29, 1986 SEI made a written offer to Mr. Cooper and Ms. Harris to purchase their interests in CBSI.

On May 30, 1986 Mr. Shields met with Mr. Cooper, Mr. Schwimmer, and Mr. Gallagher to discuss both the sale of CBSI to Cincinnati Bell and SEI's offer to purchase the interests of Mr. Cooper and Ms. Harris in CBSI. Plaintiff claims that at that meeting Mr. Gallagher made several threats. Specifically, Mr. Gallagher threatened that unless SEI consented to the sale of CBSI's stock to Cincinnati Bell:

- SEI's consulting agreement with CBSI would be terminated;
- Mr. Kilpatrick would be installed as CEO of CBSI;
- Mr. Shields would be barred from the CBSI premises;
- First Bank would not make loans to CBSI and would not allow CBSI to borrow funds from Harris Trust & Savings Bank;
- Defendants would infuse unnecessary funds into CBSI, thereby diluting CBSI's stock.

At the May 30, 1986 meeting Mr. Cooper rejected plaintiff's offer to purchase his stock.

On June 3, 1986, the sale of CBSI to Cincinnati Bell was closed. Cincinnati Bell paid approximately $13 million in cash for CBSI, and agreed to pay an additional contingent earnout of approximately $7 million to the shareholders of CBSI at future dates, depending on CBSI's performance. Of the $13 million paid at closing, SEI received about $1.7 million for its indirect interest in CBSI. In January of 1988 the former direct and indirect shareholders of CBSI, including SEI, agreed to an early disbursement of the contingent payout from Cincinnati Bell. SEI received over $2.6 million of the $6.06 million disbursement. Thus, SEI received a total of approximately $4.4 million as a result of the CBSI sale.

Citing evidence that CBSI was valued at the time of sale at as high as $48 million, plaintiff claims that Cincinnati Bell's total purchase price "grossly undervalued" CBSI. (12(m) Statement, ¶ 220.) Plaintiff instituted this lawsuit on December 31, 1986.

Counts I, II and III of plaintiff's amended complaint allege violations of the Racketeer Influenced and Corrupt Organization Act, 18 U.S.C. §§ 1962(b), (c) and (d), respectively ("RICO"). Counts IV, VI, VII are pendant state claims. District Judge Kocoras, to whom this case was previously assigned, dismissed Counts V, VIII and IX.

## II. DISCUSSION

■ Under Rule 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In ruling on a motion for summary judgment

the evidence of the non-movant must be believed, and all justifiable inferences must be drawn in the non-movant's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986).

■ However, when confronted with a motion for summary judgment, a party who bears the burden of proof on a particular issue may not rest on its pleading. Instead, that party must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact which requires trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). The party must do more than simply "show there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (footnote omitted). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.' "[5] *Id.*, 475 U.S. at 587, 106 S.Ct. at 1356.

In arguing that there is no genuine issue for trial, defendants challenge plaintiff's case in two ways. First, defendants argue that plaintiff cannot establish a pattern of racketeering activity as a matter of law. Second, defendants contend that plaintiff cannot establish that racketeering activity occurred as a matter of law. Because defendants' first argument is availing, the court need not reach defendants' second argument.

The RICO statute imposes criminal and civil liability upon those who engage in certain "prohibited activities." 18 U.S.C. § 1962. Section 1962 of RICO defines each prohibited activity to include, as one necessary element, proof either of "a pattern of racketeering activity" or of "collection of an unlawful debt." 18 U.S.C. § 1962(a)–(c). In this case, in its amended complaint plain-

---

5. Citing *Matsushita*, defendants urge that because the factual context of this case renders SEI's RICO claims economically implausible, then SEI must come forward with more persuasive evidence to support its claim than would otherwise be necessary. 475 U.S. at 587, 106

S.Ct. at 1356. However, because applying traditional summary judgment principles this court finds that the record taken as a whole could not lead a rational trier of fact to find for SEI, the court need not apply the higher standard advised by defendants.

tiff alleges that defendants engaged in the former—a pattern of racketeering activity.

The RICO statute defines "racketeering activity" to mean any act or threat involving specified state-law crimes, any act indictable under various specified federal statutes, and certain federal offenses.. 18 U.S.C. § 1961(1).

Of the term "pattern," however, the statute is less helpful. The statute simply states that a "pattern of racketeering activity" requires at least two acts of racketeering activity within a ten-year period. 18 U.S.C. § 1961(5).

Congress has done nothing to further illuminate RICO's pattern requirement. Accordingly, the courts have attempted to develop a meaningful concept of "pattern" —an attempt which many would argue has failed.

In its most recent pronouncement on the subject, the Supreme Court held that it is the factor of "continuity plus relationship" which combines to produce a pattern of racketeering activity. *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 109 S.Ct. 2893, 2900, 106 L.Ed.2d 195 (1989). In other words, to prove a pattern of racketeering activity a plaintiff must show that the racketeering predicate acts "are related, *and* that they amount to or pose a threat of continued criminal activity." *Id.* (emphasis in original).

█ In this case defendants argue that the predicate acts alleged by plaintiff lack the continuity required to establish a pattern. Plaintiff contends that predicate acts surrounding the following three "transactions" or "episodes" comprise the RICO pattern in this case:

(1) the $1 million capital infusion which defendants "coerced" Technology Group into making beginning in late October of 1985;

(2) plaintiff's purchase of Mr. Cooper and Ms. Harris' interest in Technology Group which defendants "prevent-

ed" between April 25, 1986,[6] and May 30, 1986;[7] and

(3) the sale of CBSI to Cincinnati Bell which defendants "forced" on June 3, 1986.

Despite plaintiff's arguments, however, this court finds as a matter of law that the acts surrounding these three "transactions" lack sufficient continuity to constitute a pattern of racketeering activity within the meaning of RICO.

The Court in *H.J. Inc.* described the "continuity" requirement for RICO patterns as follows:

"Continuity" is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition.... A party alleging a RICO violation may demonstrate continuity over a closed period of time by proving a series of related predicates extending over a substantial period of time. Predicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement: Congress was concerned in RICO with long-term criminal conduct.... Whether the predicates proved establish a threat of continued racketeering activity depends on the specific facts of each case.

*H.J. Inc.*, 109 S.Ct. at 2902. After drawing all justifiable inferences in favor of plaintiff, the facts of this case demonstrate that as a matter of law plaintiff can establish no RICO pattern.

Because defendants' alleged conduct resulted in sale of CBSI to Cincinnati Bell, plaintiff appeals primarily to the RICO "continuity" requirement as a closed-ended concept.[8] Accordingly, as noted above, plaintiff must prove a series of related predicate acts extending over a substantial period of time. Plaintiff cannot.

---

**6.** April 25, 1986 was when Mr. Shields allegedly initially telephoned Mr. Cooper to inquire about a possible purchase of Mr. Cooper and Ms. Harris' interest in Technology Group.

**7.** May 30, 1986 was when Mr. Cooper rejected plaintiff's offer to purchase his stock.

**8.** However, *see* footnote 11, *infra*.

On the contrary, there is no genuine issue of material fact that the predicate acts alleged here extended only over a few months—up to eight months at the most.[9] Moreover, because defendants' alleged conduct resulted in the sale of CBSI to Cincinnati Bell, it threatened no future criminal conduct. Thus, the alleged predicate acts do not satisfy the "continuity" requirement for RICO patterns.

Recent opinions by the Seventh Circuit Court of Appeals further convince this court that as a matter of law no RICO pattern can be found here. The Seventh Circuit has decided several cases since *H.J. Inc.* In each case the court concluded that the necessary continuity for a RICO pattern was absent. *See Hartz v. Friedman*, 919 F.2d 469, 472 (7th Cir.1990) *and cases cited therein.*

Even after *H.J. Inc.*, the Seventh Circuit has evaluated the RICO pattern requirement with reference to four factors:

(1) the number and variety of predicate acts and the length of time over which they were committed;

(2) the number of victims;

(3) the presence of separate schemes; and

(4) the occurrence of distinct injuries.

*Id.*, citing *Morgan v. Bank of Waukegan*, 804 F.2d 970, 975 (7th Cir.1986) ("the *Morgan* factors"). Analysis of these factors demonstrates the lack of a RICO pattern here.

The first *Morgan* factor—the number and variety of predicate acts and the length of time over which they were committed—undermines plaintiff's allegations of a RICO pattern. The predicate acts alleged by plaintiff are indeed numerous, but not of great variety. *Olive Can Co., Inc. v. Martin*, 906 F.2d 1147, 1151 (7th Cir.1990). The alleged predicate acts include: (1) a Hobbs Act violation when defendants "forced" Technology Group to make a capital infusion in the fall of 1985 by threatening dilution; (2) Hobbs Act violations—specifically, a series of threats [10]—in connection with both plaintiff's offer to purchase Mr. Cooper's and Ms. Harris' stock and the sale of CBSI to Cincinnati Bell; and (3) Travel Act violations resulting from travel by representatives of Cincinnati Bell to Chicago in connection with discussions leading up to the sale of CBSI to Cincinnati Bell. (Pl.Mem. in Opposition at 27, 31, 37–38.)

Although numerous, these acts occurred over a relatively short period of time. As noted above, the alleged predicate acts in this case extended over a period of only seven or eight months—from the threats leading to the "coerced" capital contribution of late October of 1985, to the sale of CBSI to Cincinnati Bell on June 3 of 1986. In the context of the particular case, numerous courts have found closed-ended schemes of this length to lack sufficient continuity to comprise a pattern.[11] *See,*

---

**9.** The relevant time frame here is from late October of 1985, the time of the alleged threats of dilution relating to the "coerced" capital contribution, until June 3, 1986, when plaintiff allegedly was "forced" to sell its interest in CBSI to Cincinnati Bell.

The parties disagree as to whether the alleged threats relating to the "coerced" capital contribution actually occurred in October of 1985, or later. However, plaintiff has presented a bit of evidence that such threats indeed were made at an October meeting. *See* Shields Dep. at 333–339. Accordingly, for purposes of this motion only, the court accepts October as the beginning of the period of alleged predicate acts.

**10.** Plaintiff argues that defendants threatened to dilute Technology Group's interest in CBSI, prohibit CBSI from exercising a loan commitment, replace CBSI's management, terminate CBSI's consulting contract with Mr. Shields and SEI,

and force Mr. Cooper to remain at CBSI under "intolerable conditions." (Pl.Mem. in Opposition at 31.)

**11.** Plaintiff argues that even if defendants' alleged racketeering activity did not extend over a substantial period of time, the continuity requirement has been satisfied as an "open-ended" concept because there is a threat of continued unlawful activity. In this case, however, plaintiff has failed to raise a genuine issue of material fact as to a "specific threat of repetition [of defendants' allegedly unlawful acts] extending indefinitely into the future." *H.J. Inc.*, 109 S.Ct. at 2902.

Citing no authority, plaintiff argues that the crime of extortion is "inherently continuous in nature." (Pl.Mem. in Opposition at 44.) Such an argument makes no sense. The court refuses to transform closed-ended RICO patterns into open-ended patterns merely because they in-

e.g., *U.S. Textiles, Inc. v. Anheuser-Busch Companies,* 911 F.2d 1261, 1267–68 (7th Cir.1990) (seventeen months); *Triad Assoc., Inc. v. Chicago Housing Authority,* 892 F.2d 583, 594–95 (7th Cir.1989) (twenty-eight months); *Menasco, Inc. v. Wasserman,* 886 F.2d 681, 684 (4th Cir.1989) (approximately one year); *Airlines Reporting Corp. v. Aero Voyagers, Inc.,* 721 F.Supp. 579, 583–85 (S.D.N.Y.1989) (thirteen months).

The short period of time of defendants' predicate acts is further highlighted by defendants' alleged overall goal in its schemes to "coerce" a sale of CBSI. (Amended Complaint, ¶¶ 1, 42.) Success in this goal necessarily would have ended defendants' misconduct "after a short period of time" even if suit "had not been brought." *Olive Can,* 906 F.2d at 1151.

Similarly, the number of victims in this case—the second *Morgan* factor—was small. In essence, the only victim here was Technology Group. Although Technology Group had three shareholders, any injury collectively suffered by those shareholders arose from the same conduct—defendants' "forced" sale of CBSI to Cincinnati Bell.[12] *Cf. Elliott v. Chicago Motor Club Insurance,* 809 F.2d 347, 350 (7th Cir.1986).

The third *Morgan* factor is the presence of separate schemes. Although the Court in *H.J. Inc.* held that a plaintiff need not prove multiple schemes to show a pattern for purposes of the RICO statute (*H.J. Inc.,* 109 S.Ct. at 2901), the existence of only one scheme still is of consequence in a RICO pattern determination. *U.S. Textiles,* 911 F.2d at 1269.

At most, there are two separate schemes in this case: (1) the "coerced" capital contribution, and (2) the "forced" sale of CBSI to Cincinnati Bell. Plaintiff has offered no evidence suggesting that the other alleged scheme—the "thwarted" sale of Mr. Cooper's and Ms. Harris' stock to plaintiff—was not a part of the "forced" sale of CBSI to Cincinnati Bell. On the contrary, plaintiff alleges that defendants prevented Mr. Cooper and Ms. Harris from selling their interests in CBSI expressly to further the "forced" sale of CBSI to Cincinnati Bell. *See, e.g.,* Amended Complaint, ¶¶ 45, 50.

Indeed, however, plaintiff's allegations are susceptible to being characterized as but one scheme. As discussed in footnote 11, above, plaintiff itself characterized defendants' RICO scheme as designed "to extort and coerce the sale of minority stock in [CBSI]." (Amended Complaint, ¶ 1; *see also* ¶ 42.) Accepting plaintiff's characterization, the "coerced" capital contribution was but a part of defendants' single scheme of divesting the minority shareholders of the CBSI stock. Indeed, plaintiff

---

volve extortion. *See Millonzi v. Collins,* slip op. (N.D.Ill. Aug. 10, 1989) (1989 WL 91888 at *4).

Plaintiff also argues that the threats of dilution relating to the "coerced" capital contribution risked repetition. However, plaintiff has presented no evidence raising a genuine issue of material fact as to a threat of future criminal conduct.

On the contrary, plaintiff's evidence leaves open the question of why defendants would "coerce" a capital contribution from plaintiff in the first place. The only illumination on this subject comes from plaintiff's own amended complaint, which describes the purpose of defendants' "unlawful scheme" as the extortion and coercion of the sale of minority stock in CBSI. (Amended Complaint, ¶ 1; *see also* ¶ 42.) However, if defendants "coerced" plaintiff into making capital contributions with the goal of ultimately forcing a sale of stock held by Technology Group, then the "coerced" capital contribution scheme is closed-ended as well: sale of the minority shares in CBSI necessarily would obviate any future threat of criminal activity.

The court finds that because there is no genuine dispute that defendants' actions were motivated by nothing other than a goal of coercing the sale of minority stock in CBSI, defendants' alleged scheme had "a natural ending with no threat of continued criminal activity." *Olive Can,* 906 F.2d 1147 at 1151. Accordingly, there is no real dispute that no "specific threat of repetition" exists here.

Finally, plaintiff has introduced no admissible evidence suggesting that defendants' alleged predicate acts or offenses are part of defendants' "regular way of doing business." *H.J. Inc.,* 109 S.Ct. at 2902.

12. Any injury Mr. Cooper and Ms. Harris may have suffered from allegedly being prevented from selling their CBSI stock to Mr. Shields was incidental to defendants' overall alleged scheme to force the sale of CBSI to Cincinnati Bell.

Additionally, plaintiff has failed to present any admissible evidence suggesting that defendants typically engage in the predicate acts alleged so as to implicate other potential victims. *See, e.g., U.S. Textiles,* 911 F.2d at 1269.

has offered no evidence raising a genuine issue of material fact as to any other motivation for the "coerced" capital contribution.

The final *Morgan* factor is the occurrence of distinct injuries. The only alleged injury in this case is the reduction in profits from the sale of CBSI to Cincinnati Bell at an unduly low price. Thus, there is no real dispute that there is but one distinct injury in this case.

Thus, a "natural and common sense" application of the *Morgan* factors convinces this court that defendants' alleged predicate acts lack sufficient continuity to constitute a pattern of racketeering activity. *H.J. Inc.*, 109 S.Ct. at 2899. Although the number of predicate acts in this case is significant, the acts lack variety and the length of time over which they occurred was relatively short. Defendants allegedly harmed but a single victim, Technology Group. Plaintiff's characterization of its own case demonstrates that defendants engaged in but one scheme—a scheme designed to "force" Technology Group to sell its minority interest in CBSI. And there is no genuine issue of material fact that defendants' alleged conduct resulted in but one injury—supposed lost profits by Technology Group.

Because the court finds as a matter of law that the predicate acts alleged by plaintiff lack sufficient continuity to form a pattern of racketeering activity, defendants' motion for summary judgment on Counts I, II and III must be granted. Finding no prudential reason to retain plaintiff's pendant state claims, the court dismisses Count VI, VI, and VII as well. *Olive Can*, 906 F.2d at 1153.

## III. CONCLUSION

For the reasons stated in this memorandum opinion and order, defendants' motion for summary judgment on all remaining counts of plaintiff's amended complaint is GRANTED. This case is DISMISSED in its entirety.