**MIDWEST GRINDING CO., INC., an Illinois corporation, Plaintiff,**

**v.**

**Joshua M. SPITZ, an individual, Aron Grunfeld, an individual, and U.S. Grinding & Fabricating, Inc., an Illinois corporation, Defendants.**

**No. 86 C 6480.**

United States District Court, N.D. Illinois, E.D.

June 20, 1991.

Richard J. Jacobson, Weston W. Hanscom, Keck, Mahin & Cate, Chicago, Ill., for plaintiff Midwest Grinding Co., Inc.

William L. Kabaker, Cecilia M. Clarke, Schwartz & Freeman, Chicago, Ill., for defendants Joshua M. Spitz, Aron Grunfeld and U.S. Grinding & Fabricating, Inc.

### MEMORANDUM OPINION AND ORDER

ROVNER, District Judge.

### I. INTRODUCTION

In its second amended complaint, plaintiff Midwest Grinding Company, Inc. ("Midwest") alleges that its former employee, defendant Joshua M. Spitz ("Spitz"), and the new corporation which Spitz allegedly helped to form and operate, defendant U.S. Grinding & Fabricating, Inc. ("U.S. Grinding"), violated the federal Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–68, by among other things, soliciting and servicing cus-

tomers of plaintiff's grinding services.[1] In addition to this federal RICO claim, Midwest also alleges, pursuant to Illinois common law, that Spitz breached his fiduciary duties owed to plaintiff and that U.S. Grinding and defendant Aron Grunfeld ("Grunfeld") tortiously interfered with plaintiff's contractual relationships and reasonable business expectations with its grinding customers. As a result, plaintiff requests that the Court order the defendants to account to Midwest for all proceeds from sales by U.S. Grinding and that the Court impose a constructive trust in favor of plaintiff on all such proceeds.

Pending before the Court are defendants' motion for summary judgment and motion to strike plaintiff's statement of additional material facts, which plaintiff submitted in conjunction with its opposition to defendants' summary judgment motion. For the reasons stated herein, the Court will grant defendants' motion for summary judgment on plaintiff's RICO claim. The evidence presented by plaintiff in opposition to defendants' motion fails to establish a "pattern of racketeering activity" under the RICO statute. Such a pattern of illegal conduct is an essential element of a RICO claim pursuant to §§ 1962(c) & (d). Because the Court will grant summary judgment in favor of defendants on the RICO claim and because that claim provides the only basis for the Court's jurisdiction over plaintiff's second amended complaint, the Court also will dismiss plaintiff's pendent state law claims without prejudice to a subsequent state court action on those claims. The Court's resolution of the motion for summary judgment makes it unnecessary to address the merits of defendants' motion to strike plaintiff's statement of additional material facts. That motion, therefore, is denied as moot.

## II. FACTS

Plaintiff Midwest is an Illinois corporation engaged in the business of supplying metal grinding services. (Defendants' 12(m) Statement ("Def. 12(m)") ¶ 1.)[2] Dur-

---

1. Defendants earlier had moved to dismiss plaintiff's RICO claim for failure to state a claim. The Court granted the motion in part, dismissing plaintiff's allegations that Spitz and U.S. Grinding had violated §§ 1962(a) & (b) of the RICO statute. *Midwest Grinding Co. v. Spitz,* 716 F.Supp. 1087, 1090–92 (N.D.Ill.1989). The Court also dismissed plaintiff's allegations against Grunfeld pursuant to §§ 1962(c) & (d). The Court concluded that the allegations of mail fraud leveled against Grunfeld lacked the specificity required by Federal Rule of Civil Procedure 9(b) and that those allegations were insufficient to infer the existence of an agreement between Grunfeld and Spitz to commit mail fraud. *Id.* at 1093. Similarly, the Court dismissed plaintiff's wire fraud allegations against both Spitz and Grunfeld. *Id.* The Court, however, denied defendants' motion to dismiss the § 1962(c) claim against Spitz and permitted plaintiff to proceed with this claim. In reaching this conclusion, the Court held, however, that "the only mail fraud violations against Spitz that are pled sufficiently relate to the scheme to defraud Midwest by diverting Midwest's customers to U.S. Grinding." *Id.* The Court determined that the mail fraud allegations relating to the undercharging of Cardinal Metals, Inc. and the overcharging of Klein Tools, Inc. should be dismissed. *Id.* Finally, the Court denied defendants' motion to dismiss the § 1962(d) conspiracy claim against Spitz and U.S. Grinding. *Id.* at 1094.

2. The facts as stated herein are taken from defendants' statement of material facts, plaintiff's response to that statement, and plaintiff's statement of additional material facts. In this recitation of the relevant facts, the Court will cite only to the statements submitted by the parties pursuant to Rules 12(m) and 12(n) of the local rules of this Court. Those citations, however, are intended to include the voluminous materials referenced in the parties' statements to establish the proposed facts. The Court has extensively reviewed these underlying materials. However, for the sake of brevity and convenience, it restricts its citations in this opinion only to the statements submitted pursuant to the local rules.

   When the facts are in dispute, as they frequently are in this case, the Court, as it must on a motion for summary judgment, considers the facts and all reasonable inferences drawn therefrom in the light most favorable to plaintiff. Defendants have filed a motion to strike the statement of additional material facts submitted by plaintiff. In that motion, defendants challenge the admissibility of the evidence underlying the additional facts put forward in plaintiff's statement. Defendants are correct that only evidence that ultimately would be admissible if offered at trial may be used to resist a motion for summary judgment. *See Visser v. Packer Engineering Associates, Inc.,* 924 F.2d 655, 659 (7th Cir.1991) (en banc); *Colan v. Cutler–Hammer, Inc.,* 812 F.2d 357, 365 n. 14 (7th Cir.1987)

ing the time period involved in plaintiff's complaint, Spitz, the president and a director of Midwest, owned one-third of that company's outstanding capital stock. (*Id.* ¶¶ 9–10; *see also* Plaintiff's Additional Statement of Material Facts ("Pl.Add. 12(n)") ¶ 41.) The other two-thirds of Midwest's stock was owned by Klein Tools, Inc. ("Klein Tools"), a customer of Midwest which purchased the stock in July 1984. (Def. 12(m) ¶ 9; *see also id.* ¶ 13.) Effective August 11, 1986, Spitz resigned from Midwest and the next day became an employee of defendant U.S. Grinding, an Illinois corporation also engaged in the business of providing metal grinding services. (*Id.* ¶¶ 10, 24; *see also* Pl.Add. 12(n) ¶ 42.) The gravamen of plaintiff's complaint is that Spitz, while still employed as an officer and director of Midwest, conspired with others to form U.S. Grinding and that he directed both customers and employees of Midwest to his new corporation. Plaintiff essentially contends that this conduct breached the duties Spitz owed to Midwest by virtue of his positions as an officer and director of that corporation.

The competing corporation, U.S. Grinding, was incorporated on January 27, 1986. (Pl.Add. 12(n) ¶ 28; Def. 12(m) ¶ 16.) Plaintiff's evidence gives rise to the reasonable inference that Spitz assisted Grunfeld in the incorporation of U.S. Grinding. (Pl. Add. 12(n) ¶¶ 31–35.) The records of U.S. Grinding show that, since the time of its incorporation, Grunfeld has been the only stockholder, and Grunfeld and his wife Rachel Grunfeld have been the only directors and officers of that corporation. (Def. 12(m) ¶¶ 17, 18.) Although the records show that Spitz has never been an owner, officer, or director of U.S. Grinding, plaintiff's evidence suggests that Spitz was involved in the direction of the company dur-

ing the time that he was an officer and director of Midwest. (*See* Def. 12(m) ¶ 19; *see also infra* at 5–8.) [3]

Viewed in the light most favorable to plaintiff, the evidence establishes that the scheme to defraud alleged in the complaint began in December 1985. It was then that Spitz accompanied Grunfeld to Michigan for the purpose of examining grinding machinery to be used by a new corporation which Grunfeld and Spitz had agreed to form. (Pl.Add. 12(n) ¶¶ 14–17; *see also* Def. 12(m) ¶ 20.) In January 1986, Grunfeld signed a real estate sale contract for property that would be used by U.S. Grinding. (Pl.Add. 12(n) ¶ 21.) He also executed an industrial building lease for the same premises; that lease took effect on March 1, 1986. (*Id.* ¶ 22.) Although Grunfeld executed these documents on behalf of U.S. Grinding, Spitz also had viewed the property and was involved in negotiating the industrial building lease. (*See* Pl.Add. 12(n) ¶¶ 23–25, 27.)

U.S. Grinding commenced operations in the Spring of 1986. Prior to the time that he left Midwest in August of that year, Spitz was observed entering and exiting U.S. Grinding's business premises on a number of occasions. (*Id.* ¶¶ 77, 79–80, 82–84, 86–88, 89; *see also* Def. 12(m) ¶ 23.) In traveling to and from the office of U.S. Grinding, Spitz often used a van owned by Midwest. (Pl.Add. 12(n) ¶ 90; *see also id.* ¶ 147.) Telephone records indicate that numerous telephone calls were made from U.S. Grinding both to Midwest and to the Spitz residence. (*Id.* ¶¶ 70–73, 78, 168; *see also id.* ¶ 69.) On July 14, 1986, a Midwest pickup truck was observed at U.S. Grinding, although it was unclear for what purpose the truck was there. (*Id.* ¶¶ 76, 206.) Moreover, Spitz made at least one "pickup"

---

("the court may only consider evidence and statements that would be admissible at trial and that have probative force."), *cert. denied,* 484 U.S. 820, 108 S.Ct. 79, 98 L.Ed.2d 42 (1987). However, because of its resolution of the motion for summary judgment, the Court finds it unnecessary to reach the merits of defendants' motion to strike. Instead, the Court will assume the appropriateness of all facts offered by plaintiff. Even on the basis of those facts, the

Court finds that no pattern of racketeering activity has been established in this case.

**3.** The parties agree that Spitz never entered into a restrictive covenant or other non-competition agreement with Midwest. (Def. 12(m) ¶ 11; Pl. 12(n) ¶ 11.) Thus, there was no written agreement between Spitz and Midwest that would have prevented him from competing with that corporation or soliciting its customers after the termination of his employment.

for U.S. Grinding while he was still employed by Midwest. (*Id.* ¶ 92.)

After U.S. Grinding commenced operations, a number of Midwest customers began sending a portion of their grinding work to this new competitor in the industry. With respect to certain customers, this occurred as early as May 1986, while Spitz still was employed by Midwest. The record is replete with factual issues regarding whether Spitz was involved in obtaining some or all of this business for U.S. Grinding. The evidence presented by plaintiff permits the reasonable inference that Spitz, during the time that he was employed by Midwest, participated in the transfer of some or all of this grinding work to defendant U.S. Grinding. (*See, e.g., id.* ¶¶ 67, 94, 96, 98, 100, 103–24, 125, 127, 129–31, 133–37, 140–42.) Similarly, after Spitz resigned from Midwest, other Midwest customers began to send grinding work to U.S. Grinding. (*See id.* ¶¶ 138–39.)

In June 1986, after Spitz already had been soliciting business for U.S. Grinding, Midwest presumably experienced a decline in its grinding orders. Spitz reported to plaintiff's Board of Directors that the grinding business was in a depressed state and that he had been spending a substantial amount of his time in the field in an effort to obtain new business. (*Id.* ¶ 207; *see also id.* ¶¶ 208, 216.)

The Midwest customers who began to utilize the services of U.S. Grinding placed orders with that company in one of two ways—either orally (by telephone or in person) or by preparing and mailing to U.S. Grinding a purchase order. (Def. 12(m) ¶ 28.) At times, a customer would place an order verbally and then confirm that order in writing. (Pl. 12(n) ¶ 28.) After U.S. Grinding received an order, it would prepare five copies of an invoice, one of which eventually would be mailed to the customer as a bill for the grinding work performed. (Def. 12(m) ¶ 29.)

Plaintiff also presented evidence suggesting that Spitz may have induced other Midwest employees to become involved with U.S. Grinding during the time that they were employed by Midwest. (Pl.Add. 12(n) ¶¶ 56, 201–03; *see also* Def. 12(m) ¶¶ 31–36.) For example, Dick Harrison and Carolyn Mathewson both were employed by Midwest, both purportedly were involved with U.S. Grinding while still employed by Midwest, and both accepted positions with U.S. Grinding shortly after Spitz did so in August 1986. (Pl.Add. 12(n) ¶ 169, 175, 178–79, 181–83, 184, 187–88, 190–92, 195, 198.) Moreover, in June 1986, Spitz fired or laid off Midwest's entire night shift, which consisted of approximately six men. (*Id.* ¶¶ 210, 212; *cf. id.* ¶¶ 213–14.) Certain of these individuals were later employed by U.S. Grinding. (Def. 12(m) ¶¶ 31–36.)

On August 12, 1986, Spitz mailed to the Board of Directors of Klein Tool a request that Klein Tool buy his stock in Midwest, effective August 11, 1986. (Pl.Add. 12(n) ¶ 217; *see also* Def. 12(m) ¶ 9.) In that letter, Spitz neither disclosed the existence of U.S. Grinding nor his involvement with that company. (Pl.Add. 12(n) ¶ 217.) At the time of his resignation, Spitz knew that certain Midwest customers had been sending grinding work to U.S. Grinding. (*Id.* ¶ 218.) He also knew that certain grinders who once had been employed by plaintiff were now working for U.S. Grinding. (*Id.*) On the same day that he mailed the above letter, Spitz became an employee of U.S. Grinding. (*Id.* ¶ 42.) The U.S. Grinding payroll ledgers reflect that, beginning on September 7, 1986, that company paid Spitz a net salary of $775.00 per week. (*Id.* ¶ 58.)

Plaintiff retained an expert to ascertain the measure of its damages. The expert's opinion, as submitted to the Court with the materials on summary judgment, is that Midwest was damaged by defendants' conduct in the following ways: (1) sales lost to U.S. Grinding prior to the date of Spitz' departure from Midwest; (2) sales lost to U.S. Grinding between August 11 and December 31, 1986 as a result of contacts initiated by Spitz while still employed by Midwest; (3) loss of profit margins on sales retained by Midwest during the relevant time period as a result of competition from U.S. Grinding; and (4) compensation paid

to Spitz by plaintiff when Spitz actually was helping to form and to operate U.S. Grinding. (*Id.* ¶ 228.)

Defendants have moved for summary judgment with respect to all of plaintiff's claims, contending that Midwest has failed to establish a genuine issue of material fact as to any of the four counts in its second amended complaint. The Court reaches only the RICO claim.

## III. ANALYSIS

In moving for summary judgment, defendants bear the burden of establishing that there is no genuine issue of material fact and that they are entitled to judgment as a matter of law. *New Burnham Prairie Homes, Inc. v. Village of Burnham,* 910 F.2d 1474, 1477 (7th Cir.1990); Fed.R.Civ.P. 56(c). The Court must consider the facts and all reasonable inferences drawn therefrom in the light most favorable to the nonmovant, and where there are doubts as to whether a genuine factual dispute exists, the Court must resolve such doubts in favor of Midwest, the nonmoving party. *Burnham,* 910 F.2d at 1477. However, once the movants have satisfied their initial burden, the nonmovant has the affirmative burden to come forward with evidence demonstrating that there is a genuine issue of material fact which must reach the factfinder. *Id.; Baucher v. Eastern Indiana Production Credit Association,* 906 F.2d 332, 334 (7th Cir.1990). A disputed fact is material when it is "outcome determinative under the governing law." *Whetstine v. Gates Rubber Co.,* 895 F.2d 388, 392 (7th Cir.1990); *see also Shlay v. Montgomery,* 802 F.2d 918, 920 (7th Cir.1986). A fact is genuinely in dispute when " 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' " *Whetstine,* 895 F.2d at 392 (quoting

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986)).

## A. Count I—The RICO Claim.

Defendants contend that they are entitled to summary judgment on count I of plaintiff's second amended complaint, which alleges violations of §§ 1962(c) & (d) of the RICO statute, 18 U.S.C. §§ 1962(c) & (d). Section 1962(c) makes it unlawful "for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." Section 1962(d) makes it unlawful to conspire to violate subsections (a), (b), or (c) of § 1962. Plaintiff's § 1962(c) claim is directed only at defendant Spitz, whereas the § 1962(d) conspiracy claim is aimed at both Spitz and U.S. Grinding. *See Midwest,* 716 F.Supp. at 1093–94.[4]

To establish a violation of § 1962(c), plaintiff must show that Spitz conducted an enterprise through a pattern of racketeering activity. *Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 496, 105 S.Ct. 3275, 3285, 87 L.Ed.2d 346 (1985); *Hartz v. Friedman,* 919 F.2d 469, 471 (7th Cir.1990); *Haroco, Inc. v. American National Bank and Trust Co.,* 747 F.2d 384, 387 (7th Cir.1984), *aff'd,* 473 U.S. 606, 105 S.Ct. 3291, 87 L.Ed.2d 437 (1985). Plaintiff contends that Spitz conducted U.S. Grinding, the RICO "enterprise" in this instance, through such a pattern of illegal activity. The predicate acts purportedly giving rise to a RICO violation are those of mail fraud; plaintiff contends that Spitz violated the mail fraud statute by devising a scheme to defraud

---

**4.** In its response to defendants' motion, plaintiff requests that the Court reconsider its ruling dismissing the § 1962(d) conspiracy claim against defendant Grunfeld. (Midwest Mem., at 15.) In its earlier opinion, the Court held that plaintiff's allegations were "insufficient to infer that Grunfeld agreed with Spitz to engage in the predicate acts of mail and wire fraud." *Midwest,* 716 F.Supp. at 1094. Plaintiff subsequently asked the Court to reconsider its ruling dis-

missing the § 1962(d) conspiracy claim against Grunfeld. In its minute order dated July 3, 1989, the Court denied that request. Now, at the summary judgment stage, the Court again declines to reinstate the RICO conspiracy claim against Grunfeld. A contrary conclusion, however, would not alter the Court's ultimate determination that plaintiff has failed to establish a pattern of racketeering activity in this case.

Midwest and by using the mails for the purpose of executing that scheme. *See* 18 U.S.C. § 1341; *Midwest*, 716 F.Supp. at 1092 & n. 1. The mailings at issue are the series of invoices sent by U.S. Grinding to former customers of Midwest, as well as the August 12, 1986 letter from Spitz to Klein Tools in which Spitz requested that Klein Tools purchase his Midwest shares.[5] According to plaintiff, the invoices were instrumental in defendants' scheme to defraud Midwest because they were the vehicle through which U.S. Grinding collected payments from Midwest's former customers. Moreover, the August 12, 1986 letter purportedly furthered the scheme because, in requesting that Klein Tools purchase his Midwest shares, Spitz failed to inform Klein Tools of his involvement with U.S. Grinding, a company that was directly competing with Midwest in the market for grinding services.

In the present motion, Spitz advances three independent bases for a grant of summary judgment in his favor on the RICO count. First, Spitz claims that the scheme to defraud was complete when the invoices at issue were mailed to Midwest's former customers and that, therefore, the mailings were not made in furtherance of the scheme to defraud. Second, Spitz argues that plaintiff has failed to establish the requisite "pattern of racketeering activity" in light of the Supreme Court's decision in *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989). Finally, Spitz contends that plaintiff has not shown that he conducted or participated in the affairs of U.S. Grinding, the "enterprise" for purposes of plaintiff's RICO claim. Because it finds that plaintiff has failed to establish a pattern of racketeering activity, the Court grants defendants' motion on that ground and will not reach Spitz' alternative arguments.

1. The "Pattern" Requirement.

Defendants contend that, even if the Court were to accept plaintiff's argument that the mailing of the invoices constitutes a prohibited predicate act of mail fraud, plaintiff still has not made out a RICO claim because it has not established the requisite pattern of racketeering activity. In advancing this argument, defendants rely primarily on the Supreme Court's decision in *H.J. Inc.*, contending that pursuant to that decision, plaintiff must prove that the racketeering acts occurred over an extended period of time and continue or pose a threat of doing so. (Defendants' Mem., at 6–7.)[6] According to defendants, plaintiff has failed to establish this "continuity" element because the fraudulent scheme alleged by plaintiff occurred at most over a three- to four-month period, and the scheme necessarily ended when Spitz resigned from Midwest. (*Id.* at 7.) Thus, defendants contend that there is no threat that the allegedly fraudulent conduct will or might continue.

In response, Midwest fails to address the possible impact of *H.J. Inc.*, but instead retorts that "[t]he Court has already rejected [defendants'] argument that the facts alleged are insufficient to support the conclusion of a pattern of racketeering activity." (Plaintiff's Mem., at 8.) In light of the Court's earlier decision on the motion to dismiss, plaintiff maintains that "Spitz would be entitled to summary judgment on the pattern point only if Midwest had no evidence to support its allegations." (*Id.*)[7]

5. In its earlier opinion, the Court found that "the only mail fraud violations against Spitz that are pled sufficiently relate to the scheme to defraud Midwest by diverting Midwest's customers to U.S. Grinding." *Midwest*, 716 F.Supp. at 1093. Accordingly, the Court dismissed those mail fraud charges which alleged use of the mails to undercharge Cardinal Metals, Inc. and to overcharge Klein Tools, Inc. *Id.*

6. *H.J. Inc.* was decided after this Court's initial decision on defendants' motion to dismiss the RICO count. In its earlier decision, the Court

had found that plaintiff had sufficiently alleged a pattern of racketeering activity under the law as it existed prior to *H.J. Inc. Midwest*, 716 F.Supp. at 1094–96.

7. The Court is mystified that plaintiff has chosen to ignore the intervening Supreme Court decision in *H.J. Inc.* The decision in *H.J. Inc.* is the Supreme Court's latest and most important pronouncement on the increasingly important RICO pattern requirement, and the decision has been extensively analyzed by our own Court of Appeals in no less than seven recent decisions.

Midwest contends that it has produced such evidence and that, therefore, the requisite pattern of racketeering activity has been established. The Court cannot agree. Under *H.J. Inc.* and subsequent decisions of the Seventh Circuit interpreting the pattern requirement, Midwest has failed to establish the existence of a pattern of racketeering activity. As a result, defendants are entitled to summary judgment on plaintiff's RICO claim.

A "pattern of racketeering activity" under the statute "consists of at least two predicate acts of racketeering committed within a ten-year period." *Olive Can Co. v. Martin*, 906 F.2d 1147, 1150 (7th Cir. 1990); *see also* 18 U.S.C. § 1961(5). The Supreme Court reaffirmed in *H.J. Inc.* that two elements are to be considered in analyzing the pattern requirement—relationship and continuity. *H.J. Inc.*, 492 U.S. at 239, 109 S.Ct. at 2900 (" 'It is this factor of *continuity plus relationship* which combines to produce a pattern.' ") (Supreme Court's emphasis) (quoting S.Rep. No. 91–617, at 158 (1969)); *see also Sedima, S.P.R.L.*, 473 U.S. at 496 n. 14, 105 S.Ct. at 3285 n. 14; *J.D. Marshall International, Inc. v. Redstart, Inc.*, 935 F.2d 815 (7th Cir.1991); *Sutherland v. O'Malley*, 882 F.2d 1196, 1203 (7th Cir.1989); *Hartz*, 919 F.2d at 472; *Morgan v. Bank of Waukegan*, 804 F.2d 970, 975 (7th Cir.1986); *Midwest*, 716 F.Supp. at 1094. To establish the requisite pattern of racketeering activity, Midwest must show both "that the racketeering predicates are related, *and* that they amount to or pose a threat of continued criminal activity." *H.J. Inc.*, 492 U.S. at 239, 109 S.Ct. at 2900 (emphasis in original); *see also U.S. Textiles, Inc. v. Anheuser–Busch Cos.*, 911 F.2d 1261, 1266 (7th Cir.1990); *Olive Can Co.*, 906 F.2d at 1150 ("To establish a pattern, the plaintiff must prove continued criminal activity or a threat of continued activity (the continuity element), and a relationship between the predicate acts (the relationship element).").

In its opinion on defendants' motion to dismiss, the Court held that plaintiff had sufficiently alleged a pattern of racketeering activity. *Midwest*, 716 F.Supp. at 1094–96. In doing so, the Court relied upon the four factors identified by the Seventh Circuit as relevant to the pattern requirement: "(1) the number and variety of predicate acts and the length of time over which they were committed; (2) the number of victims; (3) the presence of separate schemes; and (4) the occurrence of distinct injuries." *Id.* at 1094 (quoting *Jones v. Lampe*, 845 F.2d 755, 757 (7th Cir.1988)); *J.D. Marshall*, 935 F.2d at 820; *see also Morgan*, 804 F.2d at 975. Subsequent to the Supreme Court's decision in *H.J. Inc.*, the Seventh Circuit has recognized the continued vitality of these four factors in analyzing the existence of a RICO pattern. *See, e.g., Hartz*, 919 F.2d at 472; *U.S. Textiles*, 911 F.2d at 1266.

In its earlier opinion, the Court concluded that the allegations in plaintiff's second amended complaint passed the "continuity plus relationship" test. *Midwest*, 716 F.Supp. at 1095. Addressing the alleged scheme to divert business, employees, and property from Midwest to U.S. Grinding, the Court stated:

> [t]he factual circumstances alleged in Midwest's complaint with relation to this scheme are not properly characterized as only "one episode of fraud," and the multiple racketeering acts allegedly committed by defendants do not relate to only "one basic transaction." Instead, Midwest's allegations set forth a series of transactions, each of which amounted to a single episode of fraud.

*Id.* The Court concluded that, based upon the allegations in plaintiff's complaint, "[e]ach lost transaction therefore caused Midwest a distinct injury." *Id.* The Court found that the acts alleged

> were sufficiently separate in time and place to meet the "continuity" prong of

For plaintiff to ignore *H.J. Inc.* is surprising at best. If plaintiff believed that *H.J. Inc.* had no impact on whether a RICO pattern has been shown in this case, the Court would have expected plaintiff at least to articulate the basis for

its position. As it now stands, the Court must undertake to analyze the impact of *H.J. Inc.* without the benefit of plaintiff's position on this most important case.

the test. The acts related to separate transactions, caused numerous distinct injuries, and occurred over a seven-month span. At the same time, the acts are sufficiently related to meet the "relationship" prong of the test. The acts were inflicted upon the same victim, Midwest, involved the same type of fraud, and were committed somewhat closely in time.

*Id.* at 1095–96. Accordingly, the Court found the allegations sufficient to allege a pattern of racketeering activity. *Id.* at 1096.

### 2. Relationship.

■ At the summary judgment stage, the Court concludes that the relationship element of the pattern requirement still has been satisfied. The Seventh Circuit has held that predicate acts are related "if the acts 'have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events.'" *Hartz,* 919 F.2d at 472 (quoting *H.J. Inc.,* 492 U.S. at 240, 109 S.Ct. at 2901); *see also J.D. Marshall,* 935 F.2d at 820; *U.S. Textiles,* 911 F.2d at 1267; *Sutherland,* 882 F.2d at 1204. In its earlier opinion, the Court held that the acts of mail fraud alleged in plaintiff's complaint satisfied the "relationship" test because the "acts were inflicted upon the same victim, Midwest, involved the same type of fraud, and were committed somewhat closely in time." *Id.* In their motion for summary judgment, defendants do not challenge the existence of a relationship between the predicate acts of mail fraud alleged by plaintiff, and the evidence plainly establishes the existence of such a relationship. The predicate acts involve the same type of misconduct occurring over a relatively short period of time. Moreover, all such acts were undertaken with a common purpose—to divert plaintiff's grinding business to U.S. Grinding. *See J.D. Marshall,* 935 F.2d at 820. Accordingly, the Court finds that the "relationship" element of the pattern requirement has been satisfied.

### 3. Continuity.

Defendants do contend, however, that plaintiff has failed to establish the continuity element. (Defendants' Mem., at 6–7.) In its earlier opinion, the Court found that plaintiff had pleaded facts sufficient to satisfy the continuity element because the acts alleged—the diversion of business in nearly one hundred separate transactions, the diversion of Midwest employees to U.S. Grinding, and the use of Midwest's truck for U.S. Grinding deliveries—"related to separate transactions, caused numerous distinct injuries, and occurred over a seven-month span." *Midwest,* 716 F.Supp. at 1095. Accordingly, the Court found the acts "sufficiently separate in time and place to meet the 'continuity' prong of the test." *Id.*

Defendants suggest that *H.J. Inc.,* decided by the Supreme Court after this Court's initial decision in *Midwest,* changed the rules regarding the "continuity" necessary to establish a RICO pattern. In particular, defendants focus on the Supreme Court's statement in *H.J. Inc.* that "[p]redicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy [the continuity] requirement." 492 U.S. at 242, 109 S.Ct. at 2902; *see* Defendants' Mem. at 7. It is with good reason that defendants focus on *H.J. Inc.,* for since the Supreme Court's decision in that case, the Seventh Circuit has not found a pattern of racketeering activity to exist in any civil RICO case that has presented the issue. *Hartz,* 919 F.2d at 472. Rather, in each case decided since *H.J. Inc.,* the Seventh Circuit has concluded "that the necessary continuity was absent." *Id.* (collecting cases).

■ The Supreme Court held in *H.J. Inc.* that in order to satisfy the continuity requirement, a RICO plaintiff must establish that "the predicates themselves amount to, or that they otherwise constitute a threat of, *continuing* racketeering activity.'" *H.J. Inc.,* 492 U.S. at 240, 109 S.Ct. at 2901 (emphasis in original); *see also J.D. Marshall,* 935 F.2d at 820; *U.S. Textiles,* 911 F.2d at 1267. Recognizing the difficulty in the abstract of formulating any definitive

test for continuity, the Supreme Court defined the concept as both closed- and open-ended. "Continuity," the Court held, refers "either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." *H.J. Inc.*, 492 U.S. at 241, 109 S.Ct. at 2902; *see also U.S. Textiles*, 911 F.2d at 1267; *R.E. Davis Chemical Corp. v. Nalco Chemical Co.*, 757 F.Supp. 1499, 1517 (N.D.Ill.1990) (Rovner, J.) ("the plaintiff must either demonstrate that the defendants have engaged in racketeering activity over a substantial period of time in the past, or that the defendants have embarked upon a course of racketeering activity which threatens to continue into the future."). A "party alleging a RICO violation may demonstrate continuity over a closed period by proving a series of related predicates extending over a substantial period of time;" however, "[p]redicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement." *H.J. Inc.*, 492 U.S. at 242, 109 S.Ct. at 2902.[8]

In interpreting and applying this closed-ended test of continuity, the Court is mindful of the Supreme Court's admonition that Congress intended RICO to "reach activities that amount to or threaten long-term criminal activity." *H.J. Inc.*, 492 U.S. at 243 n. 4, 109 S.Ct. at 2902 n. 4; *see also P & P Marketing, Inc. v. Ditton*, 746 F.Supp.

1354, 1367 (N.D.Ill.1990) (Lindberg, J.).[9] Whether such long-term criminal conduct exists in a particular case requires the Court to carefully examine all facts; the Seventh Circuit has held that "[n]o one factor is determinative" to the continuity analysis. *Olive Can Co.*, 906 F.2d at 1151; *see also H.J. Inc.*, 492 U.S. at 242, 109 S.Ct. at 2902 ("Whether the predicates proved establish a threat of continued racketeering activity depends on the specific facts of each case."). With these principles in mind, the Court turns to the evidence presented by the parties on the current motion.

### 4. "Continuity" is absent here.

After the Supreme Court's decision in *H.J. Inc.*, perhaps the most important of the four factors identified by the Seventh Circuit as relevant to the continuity analysis is the first: the number and variety of predicate acts and the length of time over which they were committed. In the materials presented to the Court on summary judgment, plaintiff has identified numerous instances in which the mails were used to further defendants' purportedly fraudulent scheme. Plaintiff references hundreds of invoices that were mailed by defendants to former Midwest customers in furtherance of their scheme. (*See* Midwest Mem., at 7 n. 3.) This voluminous number of predicate acts in most circumstances would sug-

---

**8.** Alternatively, a party may establish open-ended continuity "by proving a 'specific threat of repetition extending indefinitely into the future' or that the 'predicate acts or offenses are part of an ongoing entity's regular way of doing business.'" *Olive Can Co.*, 906 F.2d at 1151 (quoting *H.J. Inc.*, 492 U.S. at 242, 109 S.Ct. at 2902). Plaintiff has not established open-ended continuity in this case. Midwest admits that the conduct at issue ended in August 1986, when Spitz terminated his employment with plaintiff and began working for U.S. Grinding. (*See* Midwest Mem., at 8.) There is no evidence that the allegedly fraudulent conduct continues today or poses the slightest threat of recurring at some point in the future. Once Spitz resigned from Midwest, he and U.S. Grinding were free to compete with Midwest for grinding customers, thereby ending the scheme alleged by plaintiff. Moreover, plaintiff does not suggest that the acts of mail fraud alleged herein are part of U.S. Grinding's regular way of doing business.

As a result, plaintiff also fails that test for open-ended continuity. Plaintiff's only alternative, therefore, is to establish the closed period of repeated conduct described above.

**9.** Although the Supreme Court noted in *H.J. Inc.* that RICO was intended to reach only activities that constitute or threaten long-term criminal activity, the Court declined to adopt a rule limiting the scope of the RICO statute to those activities "characteristic either of organized crime in the traditional sense, or of an organized-crime-type perpetrator, that is, of an association dedicated to the repeated commission of criminal offenses." *H.J. Inc.*, 492 U.S. at 243–44, 109 S.Ct. at 2903. The Court held that any rationale for such an organized crime limitation on the concept of a RICO pattern "finds no support in the Act's text, and is at odds with the tenor of its legislative history." *Id.* at 244, 109 S.Ct. at 2903; *see also Sutherland*, 882 F.2d at 1203.

gest the continuity necessary to establish a pattern. In most instances, proof of a significant number of predicate acts will clearly benefit a RICO plaintiff in meeting the pattern requirement. *See U.S. Textiles,* 911 F.2d at 1268. However, with respect to the type of mail fraud involved here, the sheer number of mailings does not aid plaintiff's cause. The Seventh Circuit recently reaffirmed that it "does not look favorably on relying on many instances of mail and wire fraud to form a pattern." *Hartz,* 919 F.2d at 473. Instead, the Court of Appeals has indicated that "allegations of mail fraud and wire fraud are unique among predicate acts" because a multiplicity of such acts " 'may be no indication of the requisite continuity of the underlying fraudulent activity.' " *Id.* (quoting *Lipin Enterprises v. Lee,* 803 F.2d 322, 325 (7th Cir.1986) (Cudahy, J., concurring); *see also Ashland Oil, Inc. v. Arnett,* 875 F.2d 1271, 1278 (7th Cir.1989) ("the number of [mail and wire fraud] offenses is only tangentially related to the underlying fraud, and can be a matter of happenstance.").

These principles have particular application to the present case. The predicate acts identified by plaintiff all involve use of the mails to further defendants'

purportedly fraudulent scheme. For the most part, the mailings at issue were invoices sent to former Midwest customers requesting payment for services rendered by U.S. Grinding. Although the number of such invoices may have been great, there was little if any variety in the acts alleged. *See Olive Can Co.,* 906 F.2d at 1151 ("while there were a large number of predicate acts, they were not of great variety.").[10] Instead, U.S. Grinding utilized the mails to invoice all of its customers, both those that may have been wrongfully diverted from Midwest and others that had not been so diverted. Although numerous invoices were involved in the present case, those invoices were largely directed to a limited number of customers. As a result, the number of mailings at issue is only tangentially related to the scope of the underlying fraud.[11] In these circumstances, the Court concludes that the sheer number of invoices does not translate automatically into a pattern of racketeering activity. *See Hartz,* 919 F.2d at 473.

Moreover, and more importantly, although plaintiff suggests that the allegedly fraudulent scheme extended over a nine month period (Plaintiff's Mem., at 8),[12]

**10.** In its brief, Midwest asserts that "defendants used the mails for more than just their invoices. They also used the mails to incorporate, to pay for machinery and to offer Spitz's shares in Midwest to Klein Tools." (Plaintiff's Mem., at 7 n. 3.) The Court does not agree with plaintiff's implication that these mailings significantly expand the scope of the mail fraud involved herein. As it did in its earlier opinion, the Court again finds that the heart of plaintiff's claim lies in the alleged diversion of Midwest's customers and employees. *See Midwest,* 716 F.Supp. at 1095. The use of the mails to incorporate U.S. Grinding and to pay for machinery clearly is linked to the diversion of Midwest's customers. They are part and parcel of the same scheme. However, those mailings were not independently fraudulent, and in terms of having an effect on plaintiff, they are not events of tremendous significance to the fraud alleged herein. With the exception of those mailings and the August 12, 1986 letter from Spitz regarding the proposed sale of his Midwest shares, the primary acts of mail fraud at issue in this case—the mailing of invoices to diverted customers—were nearly identical. The sheer volume of these mailings does not support the existence of a pattern. *Cf. Ashland Oil Co.,* 875 F.2d at 1279 (RICO pattern established where allegations in-

cluded arson and bankruptcy fraud in addition to mail and wire fraud, the Court of Appeals finding that "proof that the defendants used several unlawful means of achieving the scheme's goal separates this case from ordinary business fraud cases.").

**11.** In fact, in its brief, Midwest states that it did not produce to the Court all invoices at issue "because they are cumulative and extremely voluminous." (Plaintiff's Mem., at 7 n. 3; *see also* Plaintiff's Response to Defendants' Motion to Strike ¶ 13 n. 5.) This statement proves the Court's point that the volume of mailings alone does not establish the existence of a RICO pattern.

**12.** Defendants, on the other hand, contend that the allegedly fraudulent scheme extended only for three to four months. (Defendants' Mem., at 7.) Assuming that the scheme began in December 1985, when Spitz accompanied Grunfeld to Michigan and viewed machinery that eventually would be purchased and utilized by U.S. Grinding, the Court finds that the scheme extended at most over a nine-month period. This finding, however, accords plaintiff the benefit of every possible inference to be drawn from the

there is no dispute that the scheme had a definite conclusion and that no threat of continued criminal activity is posed. As presented by plaintiff itself, the "real issue in this case ... is that for about nine months, from December 1985 into August 1986, Spitz secretly competed with Midwest, while remaining the president and a director" of that company. (Plaintiff's Mem., at 8.) [13]

Plaintiff does not suggest and has presented no evidence to prove that defendants' conduct continues today or poses a threat of continuing sometime in the future. The reason is clear—once Spitz left plaintiff's employment on August 11, 1986, he was free to compete with plaintiff. The undisputed evidence establishes that Spitz was not bound by any agreement restricting such competition. Once the employer-employee relationship between Midwest and Spitz was terminated, Spitz no longer owed plaintiff the duties of trust and loyalty associated with the positions of an officer and director. Thus, any scheme to defraud Midwest by virtue of his involvement with U.S. Grinding necessarily ended with Spitz' resignation and his subsequent employment with U.S. Grinding. Although Spitz perhaps may be liable under Illinois law for injuries sustained subsequent to the period of his breach (see Vendo Co. v. Stoner, 58 Ill.2d 289, 321 N.E.2d 1 (1974), cert. denied, 420 U.S. 975, 95 S.Ct. 1398, 43 L.Ed.2d 655 (1974)), he was free after the termination of his employment to compete with plaintiff in the market for grinding services. At that point, it was not unlawful for Spitz and U.S. Grinding to solicit Midwest's customers, for competitors regularly engage in such conduct. In short, once Spitz terminated his employment relationship with Midwest, there was no threat that the alleged unlawful conduct would continue. There can be no doubt, there-

fore, that this is a "closed-ended" case under H.J. Inc. See H.J. Inc., 492 U.S. at 242, 109 S.Ct. at 2902.

In a closed-ended case such as this, plaintiff may establish the requisite continuity only by showing "a series of related predicates extending over a substantial period of time." Id. In attempting to make such a showing here, plaintiff is met with (and fails to address) the Supreme Court's admonition in H.J. Inc. that "[p]redicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement." Id.

The Seventh Circuit extensively addressed the issue of closed-ended continuity in Olive Can Co. v. Martin, supra. In that case, the plaintiff alleged a RICO violation when the defendants established a sham corporation, concealed the existence of that corporation from plaintiffs, and utilized the corporation to divert funds owed to plaintiffs to one of the individual defendants. 906 F.2d at 1148–49. After five years of discovery, Judge Holderman granted the defendants' motion for summary judgment on the RICO claim, finding that defendants' fraudulent activity "was limited to the last six months of 1983," that the scheme was "closed-ended," and that "there was no threat of continuing racketeering activity." Id. at 1150.

The Seventh Circuit affirmed that determination, emphasizing that the fraudulent scheme alleged by the plaintiffs had "a single, short-term goal: giving [the individual defendant] a security interest in the proceeds of the sales of [a corporate defendant] without notifying their secured lender or their trade creditors." Id. at 1152. The Court concluded that

> [t]he scheme, therefore, had a natural ending with no threat of continued criminal activity. This single scheme was to be short-lived and there is no evidence

---

evidence herein. Although the initial stages of defendants' scheme may have begun in December 1985, the first predicate act of mail fraud directly affecting plaintiff did not occur until April or May of 1986, when defendants successfully diverted certain of plaintiff's customers to U.S. Grinding. The Court, therefore, could just as easily have concluded that the predicate acts

of mail fraud extended only over a four- to five-month period.

**13.** As so stated by plaintiff, the real issue in this case seems to be whether Spitz breached a common law fiduciary duty to Midwest, not whether he engaged in a pattern of racketeering activity under the federal RICO statute.

that, had the scheme worked, it would have been repeated in the future. There is, therefore, no "specific threat of repetition," nor has there been a showing that the predicate acts are part of the defendants' "regular way of doing business."

*Id.* at 1151 (quoting *H.J. Inc.,* 492 U.S. at 242, 109 S.Ct. at 2902); *see also U.S. Textiles,* 911 F.2d at 1269 ("identical economic injuries suffered over the course of two years stemming from a single contract were not the type of injuries which Congress intended to compensate via the civil provisions of RICO"); *Short v. Belleville Shoe Manufacturing Co.,* 908 F.2d 1385, 1393 (7th Cir.1990) (four stock transactions within a four- to five-month period do not give rise to a "pattern"); *Sutherland,* 882 F.2d at 1204–05 (course of conduct extending over a five-month period did not establish the necessary "continuity").

Similarly, in analyzing the RICO pattern requirement in *U.S. Textiles,* the Seventh Circuit relied upon the decision of the Third Circuit in *Marshall–Silver Construction Co. v. Mendel,* 894 F.2d 593 (3d Cir.1990). *See U.S. Textiles,* 911 F.2d at 1268–69. In that case, the Third Circuit examined an allegedly fraudulent scheme in which the defendants threatened to put the plaintiff out of business if they were not paid for certain construction work. Several months later, the defendants carried out their threat by filing a fraudulent bankruptcy petition and generating media publicity to the effect that the plaintiff was insolvent. *Marshall–Silver,* 894 F.2d at 597. The Third Circuit held that, in the absence of a "more significant societal threat," the RICO statute should not apply to "every garden-variety fraud ... accomplished through a series of wire or mail fraud acts...." *Id.* Moreover, focusing only on the duration of defendant's scheme, the Court concluded that, "[o]n these facts, the alleged illegal activity posed no threat of *additional* repeated criminal conduct over a significant period." *Id.* (emphasis in original). Instead, "the predicate acts themselves were concluded in less than seven months." *Id.* Under these circumstances, the Third Circuit found the case

expressly resolved by the Supreme Court's admonition in *H.J. Inc.* that " '[p]redicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy [the continuity] requirement.' " *Id.* (quoting *H.J. Inc.,* 492 U.S. at 242, 109 S.Ct. at 2901; *see also Kehr Packages, Inc. v. Fidelcor, Inc.,* 926 F.2d 1406, 1418 (3d Cir.1991) ("an eight-month period of fraudulent activity directed at a single entity does not constitute a pattern, absent a threat of future criminal acts"); *Hoffman Electric, Inc. v. Emerson Electric Co.,* 754 F.Supp. 1070 (W.D.Pa.1991) (dismissing RICO claim where predicate acts occurred at most over a four-month period and "there is no indication of future criminal activity posing a threat to society.").

The present case also is similar to a RICO action involving the misappropriation of a company's trade secrets that was dismissed by a Pennsylvania district court last year. *See Clement Communications, Inc. v. American Future Systems, Inc.,* 1990 WL 106762, 1990 U.S.Dist. LEXIS 9165 (E.D.Pa. July 19, 1990). In that case, the district court dismissed the RICO claims and held that the plaintiff's remedy was to seek damages in state court under a misappropriation of trade secret or breach of contract theory. The individual defendants in *Clement Communications* all were former employees of the plaintiff who then became employees of the defendant American Future Systems ("AFS"). *Id.* at *1, 1990 U.S. Dist. LEXIS 9165 at *2. While employed by the plaintiff, the individual defendants entered into agreements which prohibited disclosure or use of any of the plaintiff's trade secrets and also restricted the individual defendants from competing with plaintiff for a period of two years after the termination of their employment. *Id.* at *1, 1990 U.S. Dist. LEXIS 9165 at *2– 3. When their employment was terminated, the individual defendants accepted positions with a newly-formed subdivision of AFS, which purportedly was engaged in competition with the plaintiff and was utilizing the plaintiff's trade secrets.

The plaintiff alleged that the defendants repeatedly used the mails and wires "to

market, promote and distribute their products and conduct their business" and that such uses were predicate acts under the RICO statute sufficient to establish a pattern of racketeering activity. *Id.* at *1–2, 1990 U.S. Dist. LEXIS 9165 at *4–5. The plaintiff further alleged that the defendants' pattern of racketeering activity had injured its business through a loss of volume and revenue, and through a concomitant reduction in the value of plaintiff's business. *Id.* at *2, 1990 U.S.Dist. LEXIS 9165 at *5. The court did not agree, however, that a pattern of racketeering activity had been alleged:

> it is clear that there was but one alleged scheme to misappropriate the plaintiff's trade secrets, that the scheme took place over a brief period of time, that it had a single victim—[plaintiff]—and that it was a single, isolated scheme which does not pose a threat of continued criminal activity. Boiled down to its simplest, plaintiff's Complaint alleges that the defendants learned his trade secrets while they were employed by him and that they then left his employ, set up their own company and used his trade secrets to run their business, including but not limited to the publication of a bulletin the same as or identical to [plaintiff's]. *Once the defendants left Clement's employ and put his trade secrets to work in their own business, the harm to Clement was done and the scheme ended.* There could be no ongoing theft of trade secrets by defendants as they could hardly go back to Clement's employ to steal more. And, since it must be presumed that Clement's trade secrets had a limited business life, the value of any trade secrets stolen by defendants would quickly diminish with time. Thus, defendants have clearly not violated RICO. *Rather than a federal court action with potential treble damages, plaintiff's remedy for any alleged wrongdoing is to seek damages from defendants in state court based upon breach of contract and theft of trade secrets.*

*Id.* at *6, 1990 U.S.Dist. LEXIS 9165 at *15–16 (emphasis added); *see also Sil–Flo, Inc. v. SFHC, Inc.,* 917 F.2d 1507, 1516 (10th Cir.1990) ("At most, what has been alleged is a business deal gone sour, accompanied by the breach of fiduciary duty and various other torts by the defendants. There certainly is no open-ended threat of future illegal activity."); *Cullen v. Paine Webber Group, Inc.,* 689 F.Supp. 269, 275 (S.D.N.Y.1988) (where the alleged fraud involved defendants' recruitment of plaintiffs in order to capture their client bases, the enterprise had a clear terminating goal, and there was no suggestion that the unlawful conduct would continue).

Similarly, the fraudulent scheme involved in the present case had but a single victim—plaintiff Midwest. Moreover, the scheme clearly ended at a specific and easily identifiable point in time, and it poses no threat of continued illegal activity. Once Spitz resigned from Midwest, he was under no obligation to refrain from competing with that company. Thus, any scheme necessarily ended with the termination of his employment. Business diverted from Midwest by defendants subsequent to this termination presumably was the result of lawful competition between plaintiff and U.S. Grinding. Absent the existence of a restrictive covenant, nothing prevents an employee from competing with his former employer for a legitimate business advantage. The simple fact that U.S. Grinding retained any customers that may have been wrongfully diverted does not indefinitely extend defendants' scheme. *See Biddle Sawyer Corp. v. Charkit Chemical Corp.,* 1991 WL 60369, *4, 1991 U.S.Dist. LEXIS 4599, *11–12 (S.D.N.Y. Apr. 2, 1991) (dismissing RICO claim based upon diversion of business from the defendant's former employer to present employer).

In fact, termination of the scheme in the present case is even more definite than that in *Clement Communications,* because in the present case, Spitz was not bound by any restrictive covenant or confidentiality agreement that extended beyond the termination of his employment. The individual defendants in *Clement Communications,* on the other hand, were subject to a two-year non-competition agreement and a broad confidentiality provision. They,

therefore, had obligations and responsibilities to their former employer which extended beyond the term of their employment. Spitz had no such obligations here.

Plaintiff's remedy for the alleged breach by Spitz of the duties owed to Midwest during the term of his employment may lie in a state court action for breach of fiduciary duty or tortious interference with business relationships, not in a federal action under the RICO statute.[14] The evidence before the Court simply does not establish the sort of *long-term criminal activity* to which that statute was directed. *See H.J. Inc.*, 492 U.S. at 243 n. 4, 109 S.Ct. at 2902 n. 4. Instead, this case is more representative of the ordinary business fraud to which the RICO statute and its treble damage provision should have no application. Defendants' conduct did not pose a significant societal threat; it posed a threat to no one but plaintiff itself. Moreover, any such threat is a thing of the past; there is no chance of a recurrence. *See J.D. Marshall*, 935 F.2d at 821. At its most basic level, this is a purely private business dispute between Spitz and Midwest; moreover, that dispute is occasioned solely by their previously existing business relationship. Congress did not have such a dispute in mind in fashioning the civil treble damage remedy to the federal RICO statute. In the absence of a more significant societal threat, the RICO statute has no application to this dispute. *See Marshall–Silver*, 894 F.2d at 597.

Plaintiff has failed to establish the pattern of racketeering activity necessary to proceed under the federal RICO statute. Accordingly, defendants' motion for summary judgment on count I of the second amended complaint is granted.

*B. Counts II, III, and IV—Pendent Claims.*

Because the Court grants defendants' motion for summary judgment on plaintiff's RICO claim, the Court also will dismiss without prejudice the pendent state

law claims for breach of fiduciary duties, tortious interference, and constructive trust and accounting. The only basis for the Court's jurisdiction is the federal question posed by plaintiff's RICO claim. (*See* Second Amended Compl., at ¶ 5.) Once the Court has disposed of all federal claims in advance of trial, it is appropriate to dismiss the remaining pendent state law claims. *See Simkunas v. Tardi*, 930 F.2d 1287, 1292 (7th Cir.1991); *Olive Can Co.*, 906 F.2d at 1153. The Seventh Circuit has held that "when the federal claims are disposed of before trial, the state claims should be dismissed without prejudice almost as a matter of course." *Baltimore Orioles, Inc. v. Major League Baseball Players Assoc.*, 805 F.2d 663, 682 (7th Cir.1986), *cert. denied*, 480 U.S. 941, 107 S.Ct. 1593, 94 L.Ed.2d 782 (1987). Because the Court has disposed of the RICO claim, it will dismiss plaintiff's remaining claims without prejudice.

## IV. CONCLUSION

Defendants' motion for summary judgment on Count I of plaintiff's second amended complaint is granted. Plaintiff has failed to establish the pattern of racketeering activity necessary to maintain a claim under the RICO statute. Because the Court grants summary judgment in favor of defendants on Midwest's only federal claim, the Court dismisses the pendent claims without prejudice.

---

**14.** The Court expresses no opinion on whether the evidence currently before the Court is suffi-

cient to establish those common law claims.